GLAZIERS LOCAL UNION
558, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 84–2291.

United States Court of Appeals,
Tenth Circuit.

March 31, 1986.

David M. Silberman, Washington, D.C. (John Hurley of Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo., David Barr of Barr & Peer, Washington, D.C., and Laurence Gold, Washington, D.C., with him on the briefs), for petitioner.

Robert Bell (W. Christian Schumann and Daniel R. Pollitt on the brief), N.L.R.B., Washington, D.C., for respondent.

Before McKAY and MOORE, Circuit Judges, and WEST, District Judge.*

JOHN P. MOORE, Circuit Judge.

Kenneth Orr filed a complaint with the National Labor Relations Board (the Board) charging Glaziers Local Union 558 (the Union) with unfair labor practices in violation of § 8(b)(2) and, derivatively, § 8(b)(1)(A) of the National Labor Relations Act (the Act). The complaint alleged that the Union caused PPG Industries (PPG) to discriminate against Orr and another nonunion employee, William Gooch, Jr., by forcing PPG to fire them. Orr contended their firing was precipitated by a walkout of union members designed to bring about the termination of nonunion employees. The case was brought before an administrative law judge (ALJ) who found there was no persuasive evidence to support the allegation that the Union caused the walkout. The ALJ further concluded that even if the Union were responsible for the jobsite walkout, the evidence failed to establish that the actual motive of the Union was to cause PPG to discriminate against employees on the basis of nonunion status. Accordingly, he dismissed the complaint. After consideration of the ALJ's findings, supplemented by testimony on which he did not explicitly rely, the Board reversed the dismissal of the complaint, concluding that the Union illegally caused PPG to fire Orr and Gooch. The case is before this court on the Union's petition for review and the Board's cross-application for enforcement of its order. Because we conclude that the Board's decision is not supported by substantial evidence on the record as a whole, we reverse its order.

---

* Honorable Lee R. West, United States District Judge for the Western District of Oklahoma, sitting by designation.

## I.

PPG manufacturers, sells, and installs glass products in Kansas and Missouri, as well as in other areas of the country. Through Mo-Kan, a multiemployer bargaining association, PPG and the Union were parties to a series of labor agreements, including one in effect during the events underlying this controversy. That agreement made general references to two classes of glaziers, "journeymen" and "apprentices," while setting forth one wage rate. Glaziers were employed by Mo-Kan employers pursuant to a formal industry apprenticeship training program, which was established by a separate agreement incorporated by reference into the Mo-Kan agreement.[1] The Mo-Kan agreement also contained a lawful union security clause requiring employees to become members of the Union after a grace period. It further included a "no-strike" clause, a commitment by the Union not to strike over disputes arising under the contract.

While the Mo-Kan agreement did not specify procedures or priorities for the hiring and referral of employees on construction jobs, the long-standing practice among Mo-Kan employers was to use the Union as the primary source for referral of glaziers. When the Union was unable to locate glaziers to satisfy employer requests, Mo-Kan employers directly hired employees to work as glaziers. According to custom on Mo-Kan jobs, direct hires were referred to the Union to obtain a "permit," a certificate which established that the holder had been hired with the knowledge and acquiescence of the Union. The permit system was designed to prevent potential jobsite harassment by employees in other trades or from union representatives policing compliance with union security agreements. The union security clause in the Mo-Kan agreement was not customarily enforced against permit holders, apparently due to the fact that permits were issued only for the dura-

---

1. The terms of the agreement covering the apprenticeship training program were not included in the record in this case, though the existence of an established formal program was undisputed.

tion of a job or thirty days, whichever period was shorter. Therefore, according to the traditional practice followed by the Union and Mo-Kan employers, permit men enjoyed only a temporary status and were replaced with journeymen when journeymen became available for referral by the Union.[2] Deviation from this traditional practice is at the heart of this dispute.

From approximately June 1981 through March 1982, PPG was engaged in the installation of window glass on a project known as the "North Supply job" in Gardner, Kansas. In August 1981, regular glass installation work commenced at the jobsite. To fulfill its requirements for glaziers, PPG, through construction manager William Gooch, Sr., requested referrals of journeymen glaziers from the Union. At some point in August, Jack Zander, the Union's business representative, informed Gooch that the Union was unable to locate additional journeymen in the area. PPG then resorted to direct hiring, eventually employing seven or eight persons, including Kenneth Orr and William Gooch, Jr., construction manager Gooch's son.[3] All of the direct hires were referred to the Union for temporary work permits, which were issued without incident.

On several occasions in October 1981, Zander or Charles Foland, assistant business representative for the Union, notified PPG through construction manager Gooch that there were journeymen available for referral to the North Supply job. The Union repeatedly requested that permit men on the job be replaced with the available journeymen. On each occasion, Gooch refused, stating that he was satisfied with the permit employees and that he was not interested in additional employees at that time.[4] Zander complained to Gooch that the company's refusal to replace permit men with available journeymen glaziers was not "the way that this thing has been operated"; that it would "destroy the apprenticeship program"; and that it "was not fair to the apprentices and the way that the apprenticeship program has been run in the past." Gooch remained steadfast in his refusal, and no further discussions on the subject transpired between Gooch and Union representatives until January.

Between the end of October and early January, dissatisfaction with PPG's refusal to replace the permit men increased among union glaziers on the North Supply job. While visiting the jobsite on an unrelated matter, Zander spoke with James Davis, a journeyman member of the Union, who stated that he and other workers "didn't want to put up with it and they were going to walk off." Zander testified that he advised Davis that a walkout would be in violation of the contract and that "it just couldn't happen." Employee concern over the situation was raised during at least two union meetings between October and January. On each occasion, Zander informed

2. The record in this case fails to reveal precisely how an employee becomes qualified as a journeyman. From the usage of the term "journeyman" by witnesses and attorneys during the hearing, the ALJ concluded that journeyman implies the "possession of substantial qualifying experience" and the "satisfaction of a rather specific set of criteria which distinguish apprentices from journeymen and which results in some sort of formal certification of journeyman status." The ALJ found that journeymen were generally more qualified than permit men; in fact, several permit holders at the jobsite involved in this controversy were awaiting entry into the formal apprenticeship program to eventually be certified as journeymen, an opportunity available to permit holders on a limited basis.

3. According to information available in the record, neither Orr nor Gooch was an experienced glazier. Orr previously worked for PPG in an unspecified capacity and was employed as a sign hanger by another company when he accepted work on the North Supply job. Gooch, Jr., was employed by another firm in an unrelated construction trade at the time PPG offered him employment.

4. In response to Union requests that the permit men be replaced with available journeymen, Gooch stated that he could not legally bump the permit employees to give jobs to other people. The ALJ, noting that Gooch failed to explain the basis for this assertion, found that Gooch's concern that the proffered journeymen were striking auto glass workers who might not remain on the North Supply job after the strike ended was a more important consideration in Gooch's decision than concern over potential illegalities.

members that the Union had done all it could to accomplish the replacement of the permit men with journeymen. He informed the members that they would have to quit their jobs and seek employment elsewhere if they were dissatisfied with working conditions at the jobsite. Zander reiterated that the Union could not instigate a walkout or strike.[5] In response to specific questions from members, Zander stated that union bylaws provided for fines against members who continued to work alongside permit men. However, he also maintained that neither he nor any union officer would prefer charges for that reason, but other members could not be prevented from filing charges. Zander also stressed that he would personally prefer charges against any member who attempted to instigate a walkout.

On December 31, 1981, assistant business representative Foland contacted Gooch to inform him of the availability of qualified journeymen as a result of a strike at Atlas Glass in Kansas City. Once again, Gooch responded that he was not interested in additional employees. Several days thereafter, a union job steward, Paul Serna, approached Ernie Kraner, PPG's North Supply project manager, to express his dissatisfaction with the fact that journeymen glaziers were out of work while permit men remained on the job. A similar conversation was repeated a few days later.

The dispute came to a head on January 7, 1982. At that time, the crew at the North Supply job had been reduced through layoffs leaving a group of journeymen, a group formally involved in the apprenticeship program, a group of "waiting" apprentices, and Orr and Gooch, Jr. In at least one conversation with Kraner during the day, Serna stated his intention to "finish out the day" and "quit" and requested that

his final paycheck be mailed to him. Serna indicated that other men on the job would not be content to work "under those conditions" with permit men while journeymen were without work. Later in the day, two apprentices left the North Supply job without explanation. That evening, Jack Griffin, the general foreman, notified Kraner of his intention to take "a day of vacation" the next day. Arthur Jackson, the working foreman, stated that he would quit or be sick if the situation with the permit men was not straightened out. At the beginning of the workday the following morning, only three employees, Orr, Gooch, Jr., and a waiting apprentice reported for work. By 9 a.m., the waiting apprentice had disappeared from the work site.

On January 8, 1982, after discussing the situation at the North Supply job, Kraner and Gooch decided to discharge Gooch, Jr., and Orr and to attempt to recall the other employees, concluding that was the only way PPG could complete the job. Kraner then telephoned foremen Griffin and Jackson and asked them to return to work. Kraner also requested that Griffin and Jackson attempt to persuade other workers to return to work on the North Supply job. Gooch telephoned Zander to inquire about ways to get glaziers back on the job. Zander replied that most of the former North Supply job employees had found work on other jobs but that Gooch was "free to call" them if he wished. Apparently, Zander's only active role in the recall was to inform members who called that "things were being straightened out" and to instruct them to await a call from Griffin or the company before returning to work.

During the following week, glaziers gradually trickled back to the North Supply job. The record does not indicate that any of the journeymen the Union previously sought to

**5.** Union officials apparently believed that a walkout over the replacement of permit men would violate the no-strike clause in the Mo-Kan agreement. The ALJ was unable to conclude that a strike would have been contractually unprivileged. The no-strike clause in the Mo-Kan agreement prohibited stoppages of work as a result of "any controversy or dispute as to the meaning, or application of the provisions of the agreement." Because the contract was silent on the subject of hiring priorities as between journeymen and permit men, the ALJ noted, without deciding, the no-strike clause might have been inapplicable to a dispute over those priorities.

put on the job were hired to replace Gooch, Jr., or Orr. The dispute apparently ended with the discharge of the two permit men.

After reviewing the harmonious testimony of witnesses and weighing the credibility of those witnesses, the ALJ found that the Board's General Counsel had not adequately demonstrated that the Union caused the firing of Orr and Gooch, Jr., by bringing about a strike or other impermissible concerted activity. The ALJ first concluded there was insufficient evidence to establish that the employees who left the North Supply job engaged in a "strike," noting that a strike contemplates continuation of an employment relationship, while at least some of the employees intended to completely sever their employment ties with PPG. Even if the employees' actions could be deemed a strike, the ALJ found that the Union had not caused the strike. He determined that any references on the part of union officials to quitting the North Supply job because of dissatisfaction or to the possibility of fines for working alongside permit men were merely explanations of the members' rights and liabilities. Despite the General Counsel's urging to the contrary, the ALJ found no duty on the part of the Union to reprimand its members for leaving the job or to take affirmative action to replace those employees with journeymen until requested to do so by PPG. In finding no causation, the ALJ emphasized the continued opposition of the Union's business representative, Zander, to a walkout or a strike. While recognizing the possibility that any formal union opposition to a strike or other connected activity might be accompanied by a figurative "wink," the ALJ found no clear evidence that the Union covertly evaded responsibility for concerted activity that it was actually encouraging.

Because the complaint tied allegations of a § 8(b)(2) violation to a claim that the Union sought the termination of Orr and Gooch, Jr., due to their nonunion status, the ALJ examined the evidence pertaining to the Union's motivation. He found the testimony of Zander, Foland, and Gooch, Sr., supported the inference that the Union sought to protect the reputation of an established apprenticeship program, which he characterized as a long-standing, traditional practice guaranteeing qualified glaziers for work on employers' projects and establishing employment priorities which ensured for the Union a fair distribution of work opportunities among qualified job-seekers.[6] Furthermore, if the Union's actual objection to retention of the permit men was their nonunion status, the ALJ reasoned that the Union could have corrected the problem through enforcement of the valid union security clause in the contract. After determining that the Supreme Court in *Local 357, International Brotherhood of Teamsters v. N.L.R.B.*, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961), set the "true purpose" or "real motive" in hiring or firing as the test of a § 8(b)(2) violation, the ALJ concluded that the Union was not guilty of violating the Act because union membership was not the basis on which its officials sought the replacement of permit men with journeymen. Accordingly, the ALJ dismissed the complaint in its entirety.

After a review of the record, the Board, contrary to the ALJ's findings, determined there was ample evidence that the Union caused or attempted to cause PPG to terminate Orr and Gooch, Jr. As support for its conclusion, the Board emphasized the repeated requests by union agents Zander and Foland to replace permit employees with available journeymen. It interpreted Zander's advice to union members that they would have to quit if dissatisfied with conditions at the North Supply job and his

---

**6.** In this context the ALJ pointed out that the traditional practice, while not contractually sanctioned, was not challenged by the General Counsel on the basis that it was *per se* invalid. The ALJ regarded this as "an apparent concession that such general practices do not, *per se,* violate the Act." The ALJ further noted that the Board also appears to have implicitly assumed that there was nothing unlawful, *per se,* about construction industry practices which give qualified individuals the right to displace ("bump") less qualified employees hired when the Union was unable to refer qualified help.

reference to the possibility of the imposition of fines on members for working alongside permit men as threats which encouraged members to quit the North Supply job. The Board further concluded that the Union's conduct following the walkout from the North Supply job demonstrated that the Union "ratified" the employees' actions, specifically noting that the Union made no effort to fill the vacated positions with available journeymen.

Once it determined that causation was established, the Board applied a presumption that a union acts illegally anytime it prevents an employee from being hired or causes an employee to be discharged to reach its ultimate conclusion that the Union violated § 8(b)(2). According to prior cases decided by the Board,[7] a union may rebut this presumption by providing "evidence of a compelling and overriding character" establishing that its conduct "was referable to other considerations, lawful in themselves, and wholly unrelated to the exercise of protected employee rights or other matters with which the Act is concerned." While the Board did not specifically dispute the ALJ's finding that the Union's actions were motivated by its desire to protect the traditional apprenticeship system, it determined that the motivation was insufficient justification to overcome the presumption of illegality. The Board ordered the Union to cease and desist from violations of § 8(b)(2) and (1)(A) of the Act and to compensate Orr and Gooch, Jr., for any loss of earnings or benefits suffered as a result of the discrimination against them. The Union was further required to contact PPG in writing requesting reinstatement of Orr and Gooch, Jr.

In this appeal, the Union contends the Board erred as a matter of law in finding that the Union violated § 8(b)(2) because the Union's intent to unlawfully discriminate against nonmembers, an element of a § 8(b)(2) violation, had not been estab-

lished. It argues that the presumption imposed by the Board disregards the controlling principle, announced in *Teamsters,* that it is the true purpose or motive for hiring or firing an employee which determines a § 8(b)(2) violation. In addition, the Union contends the operation of the presumption in connection with the requirement that rebuttal be accomplished by presentation of evidence of a compelling and overriding character that it was lawfully motivated places an impermissible burden on the Union. Even if the presumption were valid, the Union asserts that its application was unwarranted in this case because the Board erred in concluding that the Union caused PPG to terminate Orr and Gooch, Jr.

## II.

A reviewing court may reverse a decision of the Board "when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Universal Camera Corp. v. N.L.R.B.,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Enforcement of an order should be granted if the Board correctly applied the law and if its findings are supported by substantial evidence in the record as a whole. *Presbyterian/St. Luke's Medical Center v. N.L.R.B.,* 723 F.2d 1468, 1471 (10th Cir.1983); *N.L.R.B. v. Carbonex Coal Co.,* 679 F.2d 200, 203 (10th Cir.1982). The standard of review is not altered in cases in which the ALJ and the Board reached contrary conclusions. *Pennypower Shipping News, Inc. v. N.L.R.B.,* 726 F.2d 626, 629 (10th Cir.1984); *U.S. Soil Conditioning v. N.L.R.B.,* 606 F.2d 940, 945 (10th Cir.1979). However, the findings of the ALJ, whether contrary or supportive of the Board's determination, are part of

---

7. The presumption, which the Board characterizes in its brief as "longstanding," appeared in *Local 1102, United Brotherhood of Carpenters and Joiners, (Planet Corporation),* 144 N.L.R.B. 798 (1963). The Board elaborated on the pre-

sumption in *International Union of Operating Engineers, Local 18 (Ohio Contractors),* 204 N.L.R.B. 681 (1973), *enf. denied on other grounds,* 496 F.2d 1308 (6th Cir.1974).

the record to be fully considered by a reviewing court. *Universal Camera,* 340 U.S. at 492–96, 71 S.Ct. at 466–68.

In the context of these constraints and guidelines, we turn to a consideration of the Board's decision in this case. The Union appears to challenge both the validity of the presumption of illegality adopted by the Board and its application to the facts of this case.[8] The Board argues that the presumption is "a reasonable application of the Supreme Court's decisions in *Radio Officers' Union v. N.L.R.B.,* 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954), and *N.L.R.B. v. Great Dane Trailers, Inc.,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), concerning the Board's authority to apply general presumptions to the facts of particular cases." In *Radio Officers',* the Court upheld as reasonable the Board's finding that an employer violated § 8(a)(3) of the Act where the employer granted retroactive benefits to union members while denying the benefits to employees who were not union members, despite the absence of specific evidence of the employer's intent to encourage or discourage union membership. The Court concluded that intent to encourage or discourage union membership by discrimination, an element of a § 8(a)(3) violation, may be presumed where the employer's action "inherently encourages or discourages union membership," for it is a common law rule that a man is held to intend the foreseeable consequences of his conduct. *Radio Officers',* 347 U.S. at 45, 74 S.Ct. at 338. The Court also held that a union violated § 8(b)(2) when it caused an employer to reduce an employee's seniority or to fail to hire an employee because of the employee's violation of internal union rules. In *Great Dane Trailers,* an employer who paid accrued vacation benefits to nonstriking employees while withholding similar benefits from striking employees was found to have violated § 8(a)(3), despite the absence of specific evidence that the employee's conduct was motivated by a desire to discourage employees' exercise of their rights under the Act. The Board concludes that in these cases, the Supreme Court upheld as reasonable the presumption that an employee discharge caused by union conduct encourages union membership and the presumption that an employer's conduct that is inherently destructive of employees' rights is motivated by a desire to discourage union membership. The Board contends the presumption applied in this case is similarly reasonable. We disagree that the cited cases provide such a blanket endorsement of the Board's presumption.

### III.

■ We recognize the Board's authority to apply general presumptions as a part of its responsibility to formulate rules to fill the interstices of the broad statutory provisions of the Act. *Beth Israel Hospital v.*

8. The Board contends this court is without jurisdiction to consider the Union's challenge to the validity and application of the presumption because the Union failed to raise its objections before the Board. The Board's argument is clearly specious. The operation of the presumption did not become an issue until the Board relied on it in determining that the Union violated the Act. Contrary to the Board's representations, the ALJ did not specifically find that the presumption was properly applicable to this case. After finding that the Union did not cause Orr's and Gooch, Jr.'s termination and that it was motivated to seek their replacement by a desire to preserve the operation of the traditional referral system, the ALJ noted that the General Counsel failed to establish that nonmembership in the Union was a factor in the discharge of the permit men. Rather than dismiss the complaint on this basis, the ALJ bolstered his finding of no violation by determining that the Union successfully rebutted any inference of illegality. After harmonizing Board precedent with relevant Supreme Court cases, the ALJ concluded that the Union rebuts any presumption of a § 8(b)(2) violation when it is "shown to have acted in good faith to further hiring and referral practices which are of general benefit to its constituency as a whole and which only incidentally work to the employment disadvantage of particular individuals." The ALJ then found that the referral system relied on by the Union had not been challenged as invalid and that there was no showing of an actual intent to discriminate against nonmembers or other indication of bad faith on the part of the Union. The Union had no reason to object to this rather collateral reference to the presumption. Therefore, we conclude the matter is properly before this court.

*N.L.R.B.*, 437 U.S. 483, 500–01, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978); *N.L.R.B. v. American Can Co.*, 658 F.2d 746, 752 (10th Cir.1981). However, only if the presumption is rational and consistent with the Act and its application is supported by substantial evidence on the record as a whole will an order of the Board based on the presumption be enforced. *American Can*, 658 F.2d at 752–53. While *Great Dane* and *Radio Officers'* are instructive on the issue of presumed intent to encourage or discourage union membership by discrimination, the validity of the Board's presumption must be considered in light of other guidelines and criteria set out by the Court, as well as its pronouncements in those cases.[9]

We begin by noting although *Radio Officers'* approved a finding of a § 8(a)(3) violation without proof of specific intent to encourage or discourage union membership by discrimination, it also emphasized that the employer's "real motive" or "true purpose" is controlling of the determination of a § 8 violation. *Radio Officers'*, 347 U.S. at 43, 74 S.Ct. at 337. *See also Teamsters*, 365 U.S. at 675, 81 S.Ct. at 839. An inquiry into the motivation for challenged conduct is critical because § 8 "does not outlaw all encouragement or discouragement of membership in labor organizations; only such as is accomplished by discrimination is prohibited." *Radio Officers'*, 347 U.S. at 42–43, 74 S.Ct. at 336–37. *See also Metropolitan Edison Co. v. N.L.R.B.*, 460 U.S. 693, 700, 103 S.Ct. 1467, 1473, 75 L.Ed.2d 387 (1983); *American Ship Building Co. v. N.L.R.B.*, 380 U.S. 300, 311, 85 S.Ct. 955, 963, 13 L.Ed.2d 855 (1965). In cases of alleged violations of § 8(b)(2), the real purpose behind a union's actions is crucial because *"all* union-procured employment action demonstrates the union's power and thus encourages membership; and ... *all* union action is motivated by a desire, proximate or ultimate, to encourage member-

ship." *Road Sprinkler Fitters, Local No. 669 v. N.L.R.B.*, 778 F.2d 8 (D.C.Cir.1985). The Supreme Court long ago recognized that a "union is a service agency that probably encourages membership whenever it does its job well." *Teamsters*, 365 U.S. at 675–76, 81 S.Ct. at 839–40.

While the real motive or true purpose underlying challenged conduct is controlling, we recognize that proof of specific intent to encourage or discourage union membership by discrimination is not always necessary to sustain a violation of § 8 of the Act. *Radio Officers'*, 347 U.S. at 44, 74 S.Ct. at 337. *See also N.L.R.B. v. Erie Resistor Corp.*, 373 U.S. 221, 227, 83 S.Ct. 1139, 1144, 10 L.Ed.2d 308 (1963). In certain circumstances, the existence of discrimination arising from illegal motives may be inferred by the Board. In other words, "[s]ome conduct may by its very nature contain the implications of the required intent: the natural foreseeable consequences of certain actions may warrant the inference." *Teamsters*, 365 U.S. at 675, 81 S.Ct. at 839. *See also Radio Officers'*, 347 U.S. at 45, 74 S.Ct. at 338; *Erie Resistor*, 373 U.S. at 227, 83 S.Ct. at 1144.

However, where intent is to be inferred from conduct, it may be difficult to identify a true motive due to the presentation of a possible complex of motives. In such cases, the Court has divided an employer's conduct into two categories:

Some conduct is so " 'inherently destructive of employee interests' " that it carries with it a strong inference of impermissible motive. *See id.*, [*Great Dane*, 388 U.S.] at 33, 87 S.Ct., at 1797 (quoting *NLRB v. Brown, supra*, 380 U.S., at 287, 85 S.Ct., at 986). In such a situation, even if an employer comes forward with a nondiscriminatory explanation for its actions, the Board "may nevertheless draw an inference of improper motive from the conduct itself

---

**9.** At this juncture, we note that most of the applicable case law derives from alleged employee violations of § 8(a)(3) of the Act. However, the enunciated principles are equally applicable to determinations of § 8(b)(2) viola-

tions. Indeed, by the terms of § 8(b)(2), the discrimination which the Union seeks must be violative of § 8(a)(3). *N.L.R.B. v. Local 294, International Brotherhood of Teamsters*, 317 F.2d 746, 749 (2d Cir.1963).

and exercise its duty to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." 388 U.S., at 33–34, 87 S.Ct., at 1797. On the other hand, if the adverse effect on employee rights is " 'comparatively slight,' an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct." *Id.*, at 34, 87 S.Ct., at 1798 (emphasis in original).

*Metropolitan Edison,* 103 S.Ct. at 701. In the former category, the Board may essentially truncate its inquiry into the motivation underlying challenged conduct. *American Ship Building,* 380 U.S. at 312, 85 S.Ct. at 964. The foregoing categories are equally applicable to union conduct challenged under § 8(b)(2) in view of the fact that a violation of that subsection rests on the establishment of a violation of § 8(a)(3). Therefore, the parameters prescribed by the Court in *Metropolitan Edison* and *Great Dane* establish the framework for a determination that a presumption of illegality of union conduct is rationally conceived and applied.

■ Without expressly stating its intention to do so, the Board apparently relegated the Union's conduct in this case to the former category, conduct which "carries a strong inference of impermissible motive." This conclusion flows from the fact that the Board cut off its inquiry into the Union's motivation by summarily rejecting the Union's assertion that it acted out of a desire to protect the apprenticeship program when it requested the replacement of permit employees, even though there was no direct proof that the Union sought to illegally encourage membership or to promote its standing among employees in violation of the Act. After reviewing the record, we conclude that the Board's application of the presumption in this manner lacks rationality and is not supported by substantial evidence.

It was the undisputed, long-standing practice among Mo-Kan employers to seek referrals of journeymen from the Union to fill their needs for experienced glaziers. According to the traditional operation of the referral system, permit men were considered temporary employees subject to replacement by journeymen when they became available. The temporary nature of the tenure of permit holders was evidenced by the fact that the permits were issued for a limited period of time, the shorter of the duration of the job or thirty days. There was no indication anywhere in the record of any expectation on the part of permit workers, members of the Union, or other employees that permit men enjoyed anything other than a temporary status. Under the facts presented in the record, union efforts to replace permit men could not have so dramatically demonstrated its power over employees and their livelihood that the effect was to encourage union membership among employees witnessing the exercise of power. *See International Union of Operating Engineers, Local 18 (Ohio Contractors),* 204 N.L.R.B. 681 (1973), *enf. denied on other grounds,* 496 F.2d 1308 (6th Cir.1974). Encouragement of union membership is not a consequence which "inescapably flows" from the Union's actions such that the Union can be presumed to have intended it. *Erie Resistor,* 373 U.S. at 228, 83 S.Ct. at 1145. Therefore, the inference of improper motive drawn by the Board in the absence of proof of discriminatory purpose and despite the presentation by the Union of a business justification is not supported by substantial evidence.

### IV.

Even if the facts presented a situation of union conduct "inherently destructive of employee rights," we conclude that the balance struck by the Board in rejecting the Union's asserted justification for its actions is not consistent with the policies served by the Act as required by *Great Dane* and *Metropolitan Edison.* While considerable deference is due the Board's expertise in weighing employee interests against legitimate business justifications, the balance

struck between competing interests is not immune from judicial review and reversal. *N.L.R.B. v. Brown*, 380 U.S. at 290–92, 85 S.Ct. at 987–88. A reviewing court must set aside a determination of unlawful intent which rests on an "erroneous legal foundation." *N.L.R.B. v. Babcock & Wilcox Co.*, 351 U.S. 105, 112–13, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). Here, the Board's summary rejection of the Union's business justification does not comport with the Act. The Board concluded that even if the Union was motivated by a desire to preserve the traditional practice of displacing permit men with journeymen, its justification was insufficient to overcome the presumption of illegality because "[t]he practice consists of nothing more than demanding that employers replace nonmember employees with other individuals." This rationale could be applied to dismiss a union's explanation for effecting the hiring or dismissal of any nonunion employee, regardless of an underlying basis for taking its action. It could invalidate as violative of the Act the union's enforcement of any traditional practice, contractually prescribed or not, undertaken by a union in the course of representing its constituency. The Act was not intended to outlaw all such actions; it only proscribes encouragement or discouragement of union membership accomplished by discrimination. *Radio Officers'*, 347 U.S. at 42–43, 74 S.Ct. at 336–37. The Supreme Court has consistently construed the Act to permit actions taken to serve legitimate business interests even though the conduct may tend to encourage or discourage union membership. *American Ship Building*, 380 U.S. at 311, 85 S.Ct. at 963.

The Board's determination that there was "no evidence of an objective basis supporting the decisions to refer or displace particular employees" does not save the balance it struck in rejecting the Union's asserted justification. In the first place, its conclusion is not supported by substantial evidence. The existence of the referral practice, upon which PPG relied for many years to obtain glaziers, was undisputed. The operation of the referral system, which included the replacement of permit men with journeymen, was the basis of the Union's requests that PPG replace Orr and Gooch, Jr., with available journeymen. Secondly, there is no indication in the record that such practices, even though they are not contractually prescribed, are *per se* illegal or illegitimate. The validity or legality of the referral system was not challenged by the General Counsel. Thus there is no legal objection to the Union's assertion of the practice as the basis for its efforts to replace Orr and Gooch, Jr.

V.

The fact that the referral system was not contractually prescribed does not compel the conclusion that the Union's assertion of its desire to preserve the system constitutes insufficient justification to overcome the presumption. The ALJ found it insignificant that the industry practice of permitting journeymen to bump permit men was not contractually sanctioned. The Board's rejection of the Union's justification did not turn on the absence of contractual authority for the referral system. Board decisions addressing a union's rebuttal burden have not specifically mandated that a union's justification for seeking the hiring or firing of an employee be based on practices spelled out in its contract with the employer.

When the presumption of illegal action was first announced and applied by the Board in *Local 1102, United Brotherhood of Carpenters and Joiners (Planet Corp.)*, 144 N.L.R.B. 798, 800 (1963), a union's rebuttal burden was described as the production of "evidence of a compelling and overriding character showing that the conduct complained of was referrable to other considerations, lawful in themselves, and wholly unrelated to the exercise of protected employee rights or to other matters with which the Act is concerned." As we noted above, the long-standing referral practice was not challenged as unlawful. In *Ohio Contractors*, 204 N.L.R.B. at 681, the Board elaborated that a union's rationale overcomes the presumption "where the

facts show that the union action was necessary to the effective performance of its function representing its constituency." The Board later noted that "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *United Brotherhood of Painters, Local 487 (American Coatings),* 226 N.L.R.B. 299, 301 (1976), (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953)). The record established that the Union's requests to replace Orr and Gooch, Jr., included its expressed desire to protect the apprenticeship system and the manner in which it operated in the past. Any references on the part of union officials to quitting the North Supply job or to the imposition of fines for working with permit workers remaining on the job were made in response to requests for information from its members. There was no indication that this conduct was beyond the scope of reasonable actions taken to achieve the effective representation of the Union's constituency. Furthermore, there was no evidence that the Union acted in bad faith in seeking to replace Orr and Gooch, Jr. The Union repeatedly informed members that it could not instigate a walkout, nor would it impose fines on members for working with permit men. The ALJ found no evidence that the Union covertly evaded responsibility for illegal concerted activity it actually encouraged. Finally, as the ALJ found, if it had been the Union's motivation to encourage union membership, it could have invoked the valid union security clause provided in the Mo-Kan agreement. Therefore, the Board's rejection of the Union's justification for its actions did not comport with its own case law regarding a union's rebuttal burden, nor was it supported by substantial evidence.

## VI.

Because we conclude that the Board's application of the presumption of illegality to the facts of this case, specifically that

the Union's conduct was inherently destructive of employee rights, is not supported by substantial evidence on the record, we do not reach the question whether the Union caused an illegal walkout from the North Supply job. Even assuming that the General Counsel established causation and that the illegality of the Union's actions was properly presumed by the Board, we conclude that the Union met its burden in rebutting the presumption. Accordingly, we deny enforcement of the Board's order.