**RADIO–ELECTRONICS OFFICERS UNION (RADIO OFFICERS UNION), Petitioner,**

v.

**The NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 92–1145.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1993.

Decided March 4, 1994.

Suggestion for Rehearing In Banc Denied May 12, 1994.

---

Joseph E. Kolick, Jr., argued the cause for petitioner. With him on the briefs were Ira R. Mitzner and David B. Killalea.

Vincent Falvo, Attorney, National Labor Relations Board ("NLRB"), argued the cause for respondent. With him on the brief were Jerry M. Hunter, General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Attorney, and Julie B. Broido, Senior Attorney, NLRB. John Fawley and Peter Winkler, Attorneys, NLRB, also entered appearances for respondent.

Before BUCKLEY, GINSBURG, and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The Radio–Electronics Officers Union ("Union") petitions for review of an order of the National Labor Relations Board ("Board") disposing of two cases. In the first of these, the Board found that the Union operated its hiring hall in an arbitrary manner by dropping Michael Harris from its job referral list for failure to pay dues without notifying him in advance of his delinquency. We reverse the Board's decision because we find that the Union delisted Harris pursuant to a neutral, well-known hiring hall rule. In the second case, the Board found that the Union relied on an unlawful ground in refusing to refer Harry Dunleavy for employment. We conclude that substantial evidence supports the Board's finding.

## I. BACKGROUND

### A. Factual Background

The Union represents radio officers who work on vessels of the United States merchant fleet. Pursuant to collective bargaining agreements between the Union and various employers, the Union operates a hiring hall that serves as the exclusive source of referrals of radio officers for signatory employers. Union members and non-members may use the hiring hall, which is governed by "National Shipping List Rules" that are incorporated into the collective bargaining agreements. These read, in relevant part, as follows:

SECTION 1. A member must be in good standing to be placed on the National Shipping List, and must remain so to continue his employment. Non-members must pay the current quarterly service fee to be placed on the National Shipping List and must continue to pay the quarterly service fee during the period of their employment.

SECTION 2. Registration for placement on the National Shipping List shall be made in writing or in person at any port office....

SECTION 3. The National Shipping List will be updated monthly on the first business day of each month.

Joint Appendix ("J.A.") at 268–69. Thus the rules require radio officers to apply for inclu-

sion on the shipping list. An officer seeking employment must also request placement on the "on-hand" lists that are used to fill job openings on ships sailing from the Atlantic, Pacific, and Gulf coasts. Hiring hall users must be on the shipping list before they may be placed on the on-hand lists.

### 1. *Harris*

A long-time member of the Union, Michael Harris sometimes used the hiring hall. On March 15, 1988, Harris wrote the Union requesting that it place him on the Atlantic Coast on-hand list, which it did. Harris later failed to pay his quarterly Union dues, which were due April 1. Because of this delinquency, and pursuant to the rules, the Union deleted Harris's name from the shipping list. The Union sent Harris a letter on April 1 notifying him that his name had been stricken for failure to pay dues and adding, "Please remit $75 to be in good standing with [the Union]." *Id.* at 316–17.

During the preceding year, the Union had sent Harris and all other Union members monthly newsletters. The February, April, and December 1987 issues reminded them that under the shipping rules they had to remain in "good standing" with the Union in order to stay on the shipping list. For example, the April 1987 Newsletter contained the following warning:

NINE MEMBERS WERE DROPPED FROM THE APRIL NATIONAL SHIPPING LIST FOR NON–PAYMENT OF DUES. MEMBERS ARE REQUIRED TO BE IN GOOD STANDING TO GET ON THE LIST. AND THEY ARE REQUIRED TO BE IN GOOD STANDING TO STAY ON THE LIST. THE COMPUTER IS MERCILESS, AND EVEN IF YOU ARE NUMBER 1 WHEN YOU GET BEHIND IN PAYMENT OF DUES, YOU · WILL BE DROPPED FROM THE LIST IMMEDIATELY. THE BEST WAY TO AVOID THIS IS TO PAY BY THE YEAR.

*Id.* at 317.

On June 6, 1988, Harris filed an unfair labor practice charge against the Union, contending that its failure to provide him with notice and an opportunity to cure his pay-ment delinquency before removing him from the shipping list violated section 8(b)(1)(A) and (2) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(1)(A) and (2) (1988).

Subsequently, on November 30, 1988, the Union adopted the following bylaw:

Dues are required to be received by the Union at least fifteen days prior to the end of each calendar quarter and timely receipt of payment of dues ... shall be required in order to permit registration or continuation of registration on appropriate shipping lists.

J.A. at 320. Under this bylaw, the Union sends a mailing in the 15 days prior to the beginning of each new quarter advising hiring hall users that they are delinquent and that payment is required for continued registration on the shipping list. Harris attacked the new rule in a second unfair labor practice charge filed on December 6, 1988, arguing that it gave insufficient notice.

### 2. *Dunleavy*

On July 17, 1987, Harry Dunleavy, a Union member, was found guilty on internal Union charges. He was suspended from membership for one year and fined $1,000. Dunleavy never paid the fine. During his suspension, he worked aboard a vessel under contract with the American Radio Association ("ARA"), another radio officers union, from May 23 until October 18, 1988.

In a letter to the Union's hiring hall dated October 25, Dunleavy requested that he be placed on the National Shipping List for November 1988. Dunleavy telephoned the Union's hiring hall on November 4 and was told that although jobs were available, he had not been placed on the November list. The Administrative Law Judge ("ALJ") found that this telephone call had taken place on the same day but before Dunleavy had received an alternative job assignment through the ARA and before the Union had learned of that assignment. Dunleavy accepted the ARA assignment and worked aboard the *OMI Hudson* from November 7 to December 8, 1988.

In the proceedings before the ALJ, Union President Thomas Harper testified that the November shipping list had not been prepared until November 7, three days after the Union had learned of the ARA assignment. He further claimed that Dunleavy had not been listed only because he had procured another job on a seagoing vessel, a permissible ground for his exclusion. The ALJ, however, refused to believe Harper, in substantial part because of Harper's references to Dunleavy's ineligibility for a November listing in a letter dated November 3.

That letter was written by Harper in response to Dunleavy's letter requesting the listing. The ALJ determined that Dunleavy could not have received Harper's letter until after he had received the ARA assignment. The letter informed Dunleavy that he was ineligible for the November shipping list and quoted from a memorandum written by the Union's counsel giving two reasons for his ineligibility: (1) Dunleavy had failed to pay the $1,000 fine, and (2) he had violated the shipping rules "taken as a whole" by registering for employment with the ARA during his suspension. J.A. at 306–07. The Union's counsel noted: "In my opinion, any one of these reasons, standing alone, would require [a] finding of ineligibility." *Id.* at 306. In addition to the two reasons offered by the Union's counsel, Harper suggested a third: "[O]ur rules require that all vacation be taken upon the completion of any voyage and your vacation has not been taken." *Id.* at 305.

On November 14, 1988, Dunleavy filed an unfair labor practice charge against the Union, alleging that it had violated the NLRA by refusing to register him because he had failed to pay a fine; in a letter dated December 20, the Union's general counsel apprised the Board of the Union's stance on the Dunleavy case. Unlike Harper, the general counsel rested his conclusion that Dunleavy had been ineligible for the November shipping list almost entirely on Dunleavy's failure to pay the Union fine. Indeed, although he tentatively offered other reasons, he noted: "It should be made clear ... that none of these [additional reasons for ineligibility] are appropriate to consider until Mr. Dunleavy

has paid his fine for prior violation of the shipping rules." *Id.* at 310. He also admitted that the Union did not actually know whether Dunleavy had taken the mandatory vacation time, but added: "It is inappropriate ... for the Hiring Hall to examine this question while it is clear that Mr. Dunleavy is ineligible because he has failed to pay his fine." *Id.*

## B. Procedural Background

The ALJ found that the Union's failure to notify Harris of his payment delinquency before removing him from the shipping list violated section 8(b)(1)(A) and (2) of the NLRA. The ALJ's ruling rested largely on his assumption that the collective bargaining agreements governing the Union contained a union security clause. A union security clause, which bars employers from hiring non-union members, imposes a fiduciary duty on the union to give advance notice to its dues-delinquent members and afford them an opportunity to satisfy their dues obligations prior to termination. *See Communications Workers of America, Local 9509 (Pacific Bell)*, 295 N.L.R.B. 196, 200 (1989).

The Board found no evidence of a union security clause but affirmed the ALJ's decision on different grounds. It pointed out that the Union, as the operator of an exclusive hiring hall, owes a duty of fair representation to hall users that requires it to refrain from operating the hall arbitrarily. It also noted that, under Board precedent, any union action that prevents an employee from being hired is presumed to violate the statute. The Board then found that the Union had a duty to notify members of any dues they owed and to give them a reasonable opportunity to remit payment before removing their names from its referral registers, that it had acted arbitrarily and unfairly by removing Harris from the National Shipping List for non-payment of dues by operation of its rule, and that "such general notification of the dues requirement" as that provided by its inclusion in the Union bylaws and occasional mention in monthly newsletters was insufficient. NLRB Decision and Order, 306 N.L.R.B. No. 6, Jan. 21, 1992 ("Board Decision") at 5–6.

The Board adopted the ALJ's conclusion that the Union's November 30, 1988 bylaw violated the NLRA. *Id.* at 6. The ALJ had found that while fifteen days was a reasonable period to cure a payment delinquency, the Union had failed to show that each dues-delinquent hiring hall user would actually receive notice fifteen days prior to the start of the quarter.

In the Dunleavy case, the Board adopted the ALJ's finding that in refusing to place Dunleavy on the November 1988 shipping list, the Union had relied solely upon his failure to pay the fine, which was an unlawful ground. Board Decision at 2 n. 2.

## II. DISCUSSION

### A. The Harris Case

#### 1. *General Principles*

Subsection (b)(2) of section 8 of the NLRA states that

[i]t shall be an unfair labor practice for a labor organization ... to cause ... an employer to discriminate against an employee in violation of subsection (a)(3).

29 U.S.C. § 158(b)(2). Subsection (a)(3) provides, in pertinent part, that

[i]t shall be an unfair labor practice for an employer ... by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

29 U.S.C. § 158(a)(3).

■ The Supreme Court has observed that these subsections "were designed to allow employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood." *Radio Officers' Union v. NLRB*, 347 U.S. 17, 40 (1954). In *Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 778 F.2d 8 (D.C.Cir. 1985), we noted that "[w]hether particular employer conduct caused by the union actually encourages union membership need not be proved by direct evidence" but may be presumed in certain circumstances. *Id.* at 10. In particular, "conduct [by the union] which causes firing or prevents hiring demonstrates

the union's power so dramatically that its illegality is presumed." *Id.* at 11. Thus, with certain exceptions not applicable here, a presumption of illegality arises whenever an employee loses his job or a hiring opportunity as a result of a union's conduct.

To rebut this presumption, the union must show either that its action was taken pursuant to a valid union security clause, or that it "was necessary to the effective performance of its function of representing its constituency." *Id.* (internal quotation marks and citations omitted). Because the Board found that the Union's collective bargaining agreements did not contain any union security clauses, the "necessity" defense is the key to this case.

The most common example of this defense is a union's claim that it acted to enforce a provision of its collective bargaining agreement: The union asserts that a good-faith desire to abide by its contractual duties, rather than an illicit urge to encourage union membership, prompted the action that led to the employee's discharge or loss of a job opportunity. If it can sustain this claim, the union has rebutted the presumption of illegality. *See id.* at 12 (if union could establish that it had acted to protect integrity of collective bargaining agreement, that justification would suffice); *United Bhd. of Painters, Local Union No. 487 (American Coatings, Inc.)*, 226 N.L.R.B. 299, 301 (1976) ("union actions reasonably designed to preserve the integrity of contractually prescribed referral practices, even though those actions bring changes in job status to individual employees, are of a nature meeting the burden of rebuttal.").

The necessity defense, however, is not limited to actions taken pursuant to a collective bargaining agreement. It also embraces those that enforce union administrative rules that are neutral, clearly established, and consistently applied. *See Boilermakers Local No. 374 v. NLRB*, 852 F.2d 1353, 1358 (D.C.Cir.1988) (upholding unfair labor practice finding where hiring hall held some registrants to higher-than-usual standards of proof of previous job experience; "a union commits an unfair labor practice if it admin-

isters the exclusive hall arbitrarily or without reference to objective criteria"); *NLRB v. Ironworkers Local Union No. 505,* 794 F.2d 1474, 1478 (9th Cir.1986) (upholding Board's determination that union acted arbitrarily where it deviated from union's written hiring hall referral rules—rules not specified by the collective bargaining agreement); *Glaziers Local Union 558 v. NLRB,* 787 F.2d 1406, 1414–16 (10th Cir.1986) (union rebutted presumption of illegality where it acted in accordance with long-standing internal referral practice); *International Union of Operating Engineers Local 406 v. NLRB,* 701 F.2d 504, 510 (5th Cir.1983) (union's failure to notify members of change in internal hiring hall policy constituted unfair labor practice); *Teamsters Local No. 519 (Rust Engineering),* 276 N.L.R.B. 898, 902, 908 (1985) (finding unfair labor practice where union refused to refer members on ground that they failed to comply with orally instituted change to written, internal hiring hall procedures: "any departure from established exclusive hiring hall procedures which results in a denial of employment to an applicant ... breaches the duty of fair representation owed to all hiring hall users").

■ Thus, compliance with established, nondiscriminatory hiring hall procedures is a defense to an unfair labor practice charge. As the Board noted in *Rust Engineering,*

> [i]t is without question that discriminatory referrals from an exclusive hiring hall violates Section 8(b)(2) of the [NLRA]. *A nondiscriminatory exclusive hiring hall arrangement does not violate the Act nor is it unlawful for a union, such as in the instant case, to establish written rules governing the operation of the hiring hall. In fact, it is an encouraged practice to have written rules.*

*Id.* at 908 (emphasis added) (citation omitted). In sum, in the context of a statute that bars discrimination, the "necessity defense" requires a union to establish that it acted pursuant to a concrete standard—be it a collectively bargained provision, a written union rule, or a long-standing practice—any departure from which could result in a violation of its statutory duties.

### 2. *Application*

■ The presumption of illegality undoubtedly applies to the Union's delisting of Michael Harris. By striking his name from the shipping list, the Union deprived him of the chance to secure a job assignment through the hiring hall; and in doing so, it "demonstrate[d] [its] power so dramatically that [the] illegality [of its action] is presumed." *Road Sprinkler Fitters,* 778 F.2d at 11. Because its collective bargaining agreements did not contain a union security clause, the only question before us is whether the Union has rebutted the presumption by establishing a necessity defense. We conclude that it has.

Harris's automatic delisting for failure to pay dues was required by the Union's established hiring hall rules. Although the Board made no formal finding to this effect, it acknowledged that the automatic delisting rule was uniformly applied. The ALJ's opinion notes: "The Union correctly points out that the union in [a case cited by the Board's General Counsel] did not have a uniform and invariable practice of denying referrals for non-payment of dues, whereas [the Union] did.... [T]he Union treated everyone the same with respect to removing them from its National Shipping List for any delinquencies...." J.A. at 319. Similarly, the Board's brief affirmed that "[m]embers who failed to pay their dues by the start of the new quarter were automatically deleted from the job referral lists without advance notice." Brief for Respondent at 3.

Moreover, we believe it reasonable to infer that Harris was aware of this practice. While the shipping rules did not state explicitly that any radio officer who failed to pay his dues or quarterly registration fees on time would be dropped from the list, no one questions (and the monthly newsletters confirmed) that this was the automatic effect of any delinquency. We find it hard to believe that a seasoned mariner who depended on the hiring hall for his livelihood was oblivious of the consequences of failing to pay his dues on time.

The Board nevertheless insists that its precedent required the Union to provide Harris with explicit notice of the conse-

quences of his delinquency together with the opportunity to take corrective action before his name was dropped from the list. The four cases cited by the Board in support of its position, however, all involved collective bargaining agreements containing union security clauses. Under such agreements, an employee must join the union in order to secure a job with a contracting employer; and if the employee should not maintain his membership in good standing, the union has the right to require his discharge. Although permitted by statute, *see* 29 U.S.C. § 158(a)(3), such clauses are strictly regulated because they condition employment on union membership. Thus the Board has held that when enforcing a union security clause, unions must provide advance notice to members before causing an employer to discharge them for failure to pay union dues. *See, e.g., Communications Workers Local 9509 (Pacific Bell)*, 295 N.L.R.B. 196 (1989); *United Bhd. of Carpenters Local 563*, 272 N.L.R.B. 1249 (1984); *Local 1445, United Food and Commercial Workers*, 247 N.L.R.B. 1031 (1980), *enf'd*, 647 F.2d 214 (1st Cir.1981).

Here, however, the Board found no evidence of a union security clause in the Union's collective bargaining agreements, and the Board does not dispute that the Union's hiring hall was open to non-members as well as members. Therefore, the rationale for a stringent notice standard is absent here, and the union security clause cases are inapposite.

Our reasons for finding that the Union's automatic delisting of Harris did not violate the statute apply with equal force to the validity of the November 30, 1988 bylaw.

## B.  The Dunleavy Case

█  The Board's finding that the Union excluded Harry Dunleavy from the shipping list solely for an improper reason rests on fact-laden determinations of credibility and motive. We must uphold that finding as long as it is supported by substantial evidence in the record. *See* 29 U.S.C. § 160(e). We conclude that the Board has met this standard.

█  The NLRA bars a union from refusing to refer an applicant for employment because of his failure to pay a union-imposed fine. *See, e.g., NLRB v. Leece–Neville Co.*, 330 F.2d 242, 245–46 (6th Cir.1964) (unfair labor practice to cause employer to terminate employee for failure to pay fine). The Union concedes that Dunleavy's failure to pay the fine was one of the reasons motivating its decision not to place him on the November 1988 shipping list. It disputes, however, that this was its *sole* reason and argues that even if Dunleavy had paid the fine, it would have refused to register him for other, legitimate reasons. If the facts supported this argument, the Union would have a good defense under Board precedent. *See Wright Line, A Div. of Wright Line, Inc.*, 251 N.L.R.B. 1083, 1089 (1980), *enf'd on other grounds*, 662 F.2d 899 (1st Cir.1981) (when there is *prima facie* showing that protected conduct was one of several "motivating factors," burden shifts to decisionmaker to demonstrate that it would have taken same action even in absence of protected conduct). But the record contains ample support for the Board's finding that the alternative reasons offered by the Union were pretextual.

Three key pieces of evidence bear on this question. First, there is the November 3, 1988, letter from Harper to Dunleavy reciting the Union counsel's view that Dunleavy was ineligible for registration for either of two reasons: his failure to pay the fine and his acceptance of an assignment from the ARA union during his suspension. In this letter, Harper also noted, as a further reason, that Dunleavy had failed to take vacation time as required by the shipping rules.

The second piece of evidence is the December 20, 1988, letter from the Union's general counsel to the Board, which painted a different picture of the Union's motives. This letter was devoted almost entirely to an argument that Dunleavy's failure to pay the Union fine rendered him ineligible for referral. At the end of the letter, the general counsel suggested there might be other reasons for Dunleavy's ineligibility. He raised the issue of Dunleavy's mandatory vacation time but noted that "the Hiring Hall is unaware of whether Mr. Dunleavy has taken

[it]." J.A. at 310. He also raised Dunleavy's acceptance of the ARA assignment. The general counsel stated, however, that neither "of these [additional grounds] are appropriate to consider until Mr. Dunleavy has paid his fine for prior violation of the shipping rules." *Id.* The ALJ concluded that the general counsel's statements about vacation time and Dunleavy's acceptance of the ARA assignment were pretextual. Moreover, he found that the general counsel's admission that the Union did not know whether Dunleavy had taken his mandatory vacation undercut Harper's letter of November 3, which chastised Dunleavy for flouting the vacation rule. The ALJ's reliance on the general counsel's letter rather than Harper's for evidence of the Union's motives was reasonable.

Finally, there is Harper's testimony that the Union did not reach its final decision to exclude Dunleavy from the list until after it had learned of his ARA assignment on November 4. The ALJ, however, refused to believe Harper and thus rejected the Union's argument that it excluded Dunleavy from the November list only because he had accepted another job. We must uphold the ALJ's credibility determination unless it is "hopelessly incredible" or "self-contradictory." *Conair Corp. v. NLRB,* 721 F.2d 1355, 1368 (D.C.Cir.1983). It is neither. The ALJ rejected Harper's testimony for three reasons. First, the shipping rules state that "[t]he National Shipping List will be updated monthly on the first business day of each month." J.A. at 326–27. The first business day fell on November 1. Thus, the decision to exclude Dunleavy was probably made by November 1. Second, Harper's letter informing Dunleavy that he was ineligible was dated November 3, the day before the Union learned of Dunleavy's ARA assignment. Third, when Dunleavy telephoned the hiring hall on November 4 prior to receiving his ARA assignment, he was told he was not on the list.

In sum, we find that the record provides sufficient support for the Board's conclusion that the Union refused to refer Dunleavy solely because of his failure to pay the union fine.

### III. CONCLUSION

In the case of Harris, we reverse the Board's finding that the Union violated the NLRA, and deny the Board's cross-application for enforcement; in the case of Dunleavy, we grant the Board's cross-application for enforcement.

*So ordered.*