**BOILERMAKERS LOCAL NO. 374, etc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 87–1490.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1988.

Decided Aug. 2, 1988.

Bernard M. Mamet, Chicago, Ill., for petitioner.

David A. Fleischer, Atty., N.L.R.B., with whom Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and William R. Stewart, Deputy Asst. General Counsel, N.L.R.B., Washington, D.C., were on the brief, for respondent.

Before MIKVA, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Boilermakers Local No. 374 petitions for review of an order of the National Labor Relations Board, and the Board cross-applies for enforcement. The Board found that the union operated its exclusive hiring hall in a discriminatory fashion, especially by its treatment of Paul Wirthwein, Raymond Kessinger, and David Lindsey. The union claims that the Board's findings concerning these three individuals are not supported by substantial evidence, and that the Board's award of back pay was beyond its authority. We deny the petition for review and grant the cross-application for enforcement.

## I. BACKGROUND

### A. Factual Background

In late 1982, Boilermakers Local No. 374 ("the union"), located in Indiana, established an exclusive hiring hall for field construction boilermakers. Employers needing boilermakers could only hire by contacting the union, which referred boilermakers from a primary list. Those who had been out of work longest were at the top of the list, and therefore received priority. In order to qualify for the primary list, a boilermaker did not have to be a member of the union, but did have to show that he had 8,000 hours of field work. If he lacked the hours, he was placed on a secondary list.

Registration for the primary list began on December 1, 1982. The registration form asked whether the applicant had at least four years' experience as a construction boilermaker. It also asked for a list of former employers.

Although there were various irregularities in the registration and referral processes, the union asks us to review only the NLRB's findings that it acted arbitrarily toward Wirthwein, Lindsey, and Kessinger.

### 1. *Wirthwein*

Wirthwein was permitted to register but was subsequently suspended. The union's internal Joint Referral Rules, which were to govern all aspects of the operation of the hiring hall, provide that a registrant who refused two consecutive job offers without a reasonable excuse would be suspended for fifteen days. A failure to call back the union representative who proffers a job is not considered a refusal. No one disputes that Wirthwein refused a job on January 31, 1983. The union claims it sus-

pended him because he had previously refused an offer on January 7, 1983, but the Administrative Law Judge ("ALJ") concluded that he had not refused that job.

Larry Pennington, the assistant business manager in charge of the local office of the union, made the referrals from the primary list. His secretary, Cindy Gruelich, received a request for a referral on January 7 while Pennington was out of town. She eventually reached him, and Pennington in turn called Wirthwein, the next man on the primary list. Wirthwein was not in, and Pennington told Wirthwein's wife to tell her husband to call back within a specified time (either a half hour or an hour). Wirthwein returned home more than an hour later, but he nevertheless called the local office and spoke with Gruelich. At the ALJ's hearing, Gruelich testified that Wirthwein refused the job. Wirthwein testified that the job had already been given to someone else.

Gruelich's notes read as follows:
9:12 A.M. Called Paul Wirthwein—not available was given 1 hr. to return call, he did not call back. *Called back and said that his back was messed up & refused the referral.*
10:25 A.M. Called Joe Frantz—answered and accepted referral.

General Counsel's Exhibit ("GC Ex.") 87. Pennington admitted that he added the underscored portion at a later date. Transcript of ALJ Hearing ("Tr.") at 2675. The ALJ concluded that Wirthwein did not call back until after 10:25, and therefore that he did not refuse the job. Otherwise, Gruelich would immediately have modified the 9:12 entry herself. Pennington's notation was an "afterthought" added after January 31. *Boilermakers Local No. 374,* 284 N.L.R.B. No. 140 (July 27, 1987), Administrative Law Judge's Decision ("ALJ Dec.") at 51. The ALJ also relied on his estimation of Gruelich's and Wirthwein's credibility and demeanor. *Id.*

2. *Lindsey*

Lindsey was not permitted to register on the primary list. When he filled out the application, he checked the "yes" box to indicate that he had four years' experience in field construction. Pennington, who supervised the registration, told Lindsey that he had to check "no" if he did not have proof of 8,000 hours of field work *with him.* Tr. 558–59. Lindsey thereupon changed his answer to "no."

The only proof Lindsey brought with him was a computer printout of his union pension contributions, which indicated a total of 6,996 hours worked since 1974. GC Ex. 19. In order to be placed on the primary list, however, only hours worked in the field, not in the shop, could be counted. As workers contributed more to the pension fund for field work than for shop work, the report shows that all the hours since 1976, i.e., 5,340 hours, were spent in the field. Pennington nevertheless credited Lindsey with only 2,772.5 field hours, later increased by Lucas, Pennington's superior, to 4,421 hours. Both figures are inexplicable, and Pennington admitted under examination at the ALJ hearing that at least 5,340 hours should have been credited. Tr. 311–12.

Lindsey also informed Pennington that he had worked for Dixie Boiler Works ("Dixie"), a non-union firm in Kentucky. He said that he had tax records to support this claim, and that Jim Shearer, Dixie's former president, could verify it. Pennington rejected Lindsey's application. Lindsey subsequently provided a notarized letter from Shearer stating that Lindsey had worked 3,006 hours as a field boilermaker. Pennington rejected the letter because it had no letterhead. Lindsey asked what proof he needed, but Pennington refused to help. He told Lindsey to post a $100 bond and take the matter to the disputes committee, a tribunal established in the local's Joint Rules governing the operation of the hiring hall to consider employee grievances concerning the referral system. We discuss this tribunal below at 6.

Lindsey later submitted an additional letter from Shearer describing in detail the various projects Lindsey had worked on as a field boilermaker. Pennington and Lucas rejected this letter because Lindsey had failed to prove "beyond any doubt" that he

had sufficient hours and, in particular, that Dixie ever existed. GC Ex. 38. They also persisted in claiming that he had only 2,772.5 proven field hours. Lindsey then submitted Dixie's articles of incorporation, an income tax report, and an annual report. The union still refused to accept the hours.

### 3. *Kessinger*

Kessinger stated on his application that he had over four years' experience in field construction, much of it while employed by Daniels, a South Carolina company. Pennington demanded proof. Kessinger went home and returned with his tax papers, which Pennington rejected as insufficient. Kessinger then reviewed his tax papers, pension report, and check stubs. He prepared a handwritten annual summary of his hours, which he left at the union office. Pennington wrote Kessinger that the notes were inadequate proof, but he did not indicate what would constitute sufficient proof, even when Kessinger asked him. Kessinger eventually obtained a letter from Daniels indicating his hours and the jobs he worked on. Apparently, Kessinger did not submit this letter to Pennington, but he did submit it to the disputes committee. The committee rejected the letter as inadequate, and the union made no move to place Kessinger on the list. After Kessinger testified at the ALJ's hearing concerning the precise nature of his work for Daniels, the union's lawyer admitted that there was sufficient proof of 8,000 hours and stated that Kessinger would be placed on the primary list.

### B. Procedural Background

The Joint Rules provide that disputes between workers and the union may be brought by the grievant to a disputes committee composed of union and employer representatives. The grievant must post a $100 bond that is forfeited if the grievant loses. Wirthwein never sought review from the committee. Pennington informed Lindsey and Kessinger that if they disagreed with his decisions, they could seek review from the committee by posting the bond. Both refused. Pennington eventually asked the committee to consider Lindsey's and Kessinger's cases, and sent a check for $200. Lindsey did not know when the committee was to be convened until the day before the event, and he learned only the day of the hearing that the committee would consider his case.

The committee determined that neither Lindsey nor Kessinger had established that they had 8,000 hours of boilermaker field work. GC Ex. 37(b). The committee stated that Lindsey had only 2,772 field hours, a manifestly incorrect conclusion. Although one of the committee members spoke on the phone to Shearer, Dixie's former president, the committee refused to credit Lindsey these hours. ALJ Dec. at 32, Tr. 574–77. The committee also rejected as inadequately detailed the letters from Daniels indicating Kessinger's field boilermaker hours.

The National Labor Relations Board ("NLRB" or "Board") subsequently took up the charges filed by Wirthwein, Kessinger, and Lindsey. The ALJ concluded that the union had acted arbitrarily toward these individuals, denying them the assistance accorded other members of the hiring hall. The union therefore violated its duty of fair representation, that is, its obligation to deal even-handedly with the hiring hall members. The ALJ ordered the union to recompense them with back pay. The ALJ also concluded that the requirement that a grievant post a $100 bond to obtain review by the disputes committee was unlawful. The union does not challenge the ALJ's various other conclusions (e.g., threats in connection with checkoff forms, recordkeeping, treatment of other workers).

The Board accepted the ALJ's conclusions in most respects. As it adopted without discussion the ALJ's conclusions with respect to Wirthwein, Lindsey, and Kessinger, the ALJ's conclusions are the Board's. NLRB op., 284 N.L.R.B. No. 140 at 2 n. 3.

The union petitions for review, and the Board cross-applies for enforcement. The union challenges only the Board's conclusion as to Wirthwein, Lindsey, and Kessinger. It does not challenge the finding that the bond requirement is unlawful, except insofar as that finding infected the ALJ's conclusions as to these three men.

We discuss the relation between the individual liability findings and bond requirement ruling below at 13.

## II. Discussion

### A. Arbitrariness and Fair Dealing

#### 1. *General principles*

 A union commits an unfair labor practice if it attempts to coerce employees into participating in union activities. 29 U.S.C. §§ 157, 158(b)(1)(A) (1982). Similarly, a union may not cause an employer to discriminate against employees whose union membership has been denied or terminated for some reason other than non-payment of dues. *Id.* at § 158(b)(2).

These general principles apply fully to exclusive hiring hall arrangements, under which workers can obtain jobs only through union referrals. An exclusive hall is not illegal per se, but because of its potential coerciveness, the union is held to a high standard of fair dealing. The union's tremendous authority and the workers' utter dependence create

> a fiduciary duty on the part of the union not to conduct itself in an arbitrary, invidious, or discriminatory manner when representing those who seek to be referred out for employment by it.... [A]ny departure from established exclusive hiring hall procedures which results in a denial of employment to an applicant falls within that class of discrimination which inherently encourages union membership, breaches the duty of fair representation owed to all hiring hall users, and violates Section 8(b)(1)(A) and (2) of the [National Labor Relations] Act, [29 U.S.C. §§ 158(b)(1)(A) & (2) (1982),] unless the union demonstrates that its interference with employment was pursuant to a valid union-security clause or was necessary to the effective performance of its representative function.

*Teamsters Local 519 (Rust Engineering)*, 276 N.L.R.B. 898, 908 (1985) (citation omitted). No specific intent to discriminate on the basis of union membership or activity is required; a union commits an unfair labor practice if it administers the exclusive hall arbitrarily or without reference to objective criteria and thereby affects the employ-

ment status of those it is expected to represent. "By wielding its power arbitrarily, the Union gives notice that its favor must be curried, thereby encouraging membership and unquestioned adherence to its policies." *NLRB v. International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 433*, 600 F.2d 770, 777 (9th Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1275, 63 L.Ed.2d 599 (1980); *see also NLRB v. Ironworkers Local Union No. 505*, 794 F.2d 1474, 1478 (9th Cir.1986). The duty of fair representation requires the union not only to refrain from arbitrary refusals to permit registration for a hiring hall, *NLRB v. International Bhd. of Elec. Workers, Local 11*, 772 F.2d 571, 576 (9th Cir.1985), but also to inform workers of relevant rules. *See, e.g., International Union of Operating Engineers Local 406 v. NLRB*, 701 F.2d 504, 510 (5th Cir.1983); *cf. Warehouse Union, Local 860 v. NLRB*, 652 F.2d 1022, 1025 (D.C.Cir.1981) (in wage negotiations, duty of fair representation requires union to communicate with those directly affected).

We must uphold the Board's decision if it is supported by substantial evidence in the record as a whole. 29 U.S.C. § 160(e) (1982); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

#### 2. *Application to present case*
##### a. *Wirthwein*

 The union's petition must be denied if the record contains substantial evidence that Wirthwein did not refuse a referral on January 7. He stated that he did not, whereas Gruelich stated that he did. The fact that Pennington *later* changed the entry to indicate Wirthwein refused the job supports Wirthwein's version. The ALJ's conclusion was based largely on his assessment of the credibility and demeanor of the witnesses, which we will not overturn unless the testimony he credited was "inherently incredible." *District 65, Distributive Workers v. NLRB*, 593 F.2d 1155, 1160 (D.C.Cir.1978). Wirthwein's testimony was quite plausible, and the ALJ was well within his discretion in crediting it.

The union faults the ALJ for thinking that Wirthwein would not have called back

specifically to refuse a referral. This reasoning was faulty, says the union, because Wirthwein admitted that he *did* call back. But the ALJ did not conclude that Wirthwein never called back. On the contrary, he concluded that by the time Wirthwein did call back, the job had already been given away. *See* ALJ Dec. at 51. This conclusion is supported by substantial evidence.

### b. Lindsey

■ For almost all the applicants, Pennington simply accepted the hours listed in the pension fund reports. Not so for Lindsey. Pennington credited him with only 2,772.5 field hours, later increased (inexplicably) to 4,421 by Lucas. Pennington admitted at the ALJ's hearing that the reports plainly showed that Lindsey had at least 5,340 union hours. This treatment was arbitrary and disparate from that accorded other applicants, in violation of the duty of fair dealing.

Similarly flawed was the union's treatment of Lindsey's hours at Dixie. Whereas the union accepted other applicants' submissions from former employers that simply listed the number of hours worked (GC Ex. 14), even when they were not notarized and lacked a letterhead (GC Ex. 15), the union refused to credit Lindsey's repeated submissions concerning Dixie. Lucas insisted that Lindsey prove his work "beyond any doubt," a standard applied to no one else. He demanded that Lindsey provide documentation (time sheets, work schedules) required of no one else. Even after Lindsey provided the articles of incorporation and other documentary evidence of Dixie's existence, the union refused to credit him these hours. The ALJ's conclusion that the union acted arbitrarily against Lindsey is supported by substantial evidence.

### c. Kessinger

■ There was some evidence that the union imposed a higher standard of proof on Kessinger as well. For example, Kessinger submitted to the disputes committee two letters from Daniels indicating the jobs he worked on and the hours he had accumulated. These letters were at least as specific as those accepted from other applicants. GC Ex. 14, 15. Although the union complains that Kessinger did not precisely describe the work he performed on these jobs until the hearing before the ALJ, such proof was not required of other applicants.

The union's more serious failure as to Kessinger was its refusal to tell him what additional information he should have provided. After Pennington wrote Kessinger that the handwritten notes were insufficient, Kessinger went to the union office and asked Pennington what proof he wanted. Pennington said he did not want additional proof, and that if Kessinger was dissatisfied, he should go to the disputes committee. Tr. 1712–13, 1774–75. Nor did he tell Kessinger, after the committee hearing, that he should more precisely describe what work he performed. The union claims it was "sandbagged" because Kessinger "sat on" his evidence. Reply Brief at 10 n. 4. This assumes the union is merely an impassive arbiter of the adequacy of the evidence submitted. But the union must do more to satisfy its duty of fair dealing: it must explain how the applicants can qualify for placement, at least when such explanation is requested by the charging parties and is provided to others. *See above* at 9.

### B. Remedy: Back Pay

■ When the Board finds that a person has committed an unfair labor practice, it may order the violator "to take such affirmative action including reinstatement of employees with ... back pay," as it deems necessary. 29 U.S.C. § 160(c) (1982). "[B]ack pay may be required of the ... labor organization ... responsible for the discrimination suffered" by the employee. *Id.* The Board's remedial discretion under this section is broad, and our review is extremely limited. *NLRB v. Rutter–Rex Mfg. Co.*, 396 U.S. 258, 262–63, 90 S.Ct. 417, 419–20, 24 L.Ed.2d 405 (1969). Unless the award is patently beyond the Board's statutory authority, we must uphold it. *Id.* The Board may order backpay if discrimination results in the loss of a job. *See id.* Although the ALJ did not determine the precise jobs Wirthwein, Kessinger, and

Lindsey lost because of the union's discrimination, that question is properly left to the compliance stage of the proceedings. *See, e.g., NLRB v. General Truckdrivers, Warehousemen & Helpers,* 778 F.2d 207, 215 (5th Cir.1985).

The union vigorously contends that the Board exceeded its authority because, the union asserts, the back pay award was premised on the Board's finding that it was unlawful to require that a grievant post a bond to obtain review by the disputes committee. Brief for Petitioner at 24–27; Reply Brief at 5–6. When the Board concludes that the union has wrongly refused to refer a grievance to arbitration, back pay cannot be awarded until the grievance is found to be meritorious. *See, e.g., NLRB v. Eldorado Mfg. Corp.,* 660 F.2d 1207, 1215 (7th Cir.1981). That general principle does not apply here. The back pay award was based on the arbitrary treatment of Wirthwein, Lindsey, and Kessinger, not on the union's failure to send these disputes to arbitration. The Board was well within its authority in ordering back pay to compensate these men for the effects of the union's arbitrary treatment.

## C. Collateral Issues

Both parties raise a number of issues that are irrelevant or only marginally relevant.

### 1. *Bond requirement*

The union persistently argues that the Board's finding of arbitrary treatment of Lindsey and Kessinger was premised on its conclusion that the $100 bond requirement was unlawful. The union faults this reasoning because Pennington did forward these two men's grievances to the disputes committee; thus the unlawfulness of the bond requirement is "academic[ ]." Brief for Petitioner at 19.

The ALJ's finding that the union treated Lindsey and Kessinger arbitrarily was separate from his conclusions about the bond requirement. Although the ALJ speaks of the two issues together in one passage, ALJ Dec. at 45, lines 17–22, the findings are clearly distinct in his conclusions of law. ALJ Dec. at 52, lines 6–20 and lines 36–42.

### 2. *Animus deriving from separate lawsuit*

■ Wirthwein, Lindsey, Kessinger, and others were plaintiffs in a separate lawsuit challenging the union's policies concerning membership transfers. The ALJ concluded that Pennington and Lucas treated the three arbitrarily because of the lawsuit. ALJ Dec. at 45 n. 52. The parties spar at length over whether any inference can be drawn from the lawsuit, but we need not resolve this dispute. The ultimate issue is arbitrary treatment. A showing of animus may make a claim of arbitrary treatment more credible, but it is not a prerequisite.

### 3. *Arbitration*

■ The union claims that in the cases of Lindsey and Kessinger, the ALJ should have deferred to the findings of the disputes committee. (The committee never considered Wirthwein's suspension, and the union does not claim that his grievance is affected by the committee's findings.)

The Board will defer to an arbitral decision if the parties agreed to be bound, the proceedings were fair and regular, the award was not clearly repugnant to the Act, the tribunal actually considered the same statutory issues, and the statutory issue was within its competence. *See, e.g., Banyard v. NLRB,* 505 F.2d 342, 346–47 (D.C.Cir.1974). Assuming *arguendo* that the committee qualified as an arbitral tribunal, the ALJ properly did not defer to its conclusions. First, the proceedings were not fair to Lindsey because he did not learn that the committee would consider his case until the day of the hearing. Second, the committee imposed a higher burden of proof on Lindsey and Kessinger than the union had applied to other applicants. This disparate treatment is repugnant to the Act. Third, and relatedly, the committee did not consider the claim of disparate treatment. It merely ruled that these men had not adequately demonstrated their entitlement to placement on the primary list. Finally, some of the crucial facts relied upon by the ALJ occurred only after the committee hearing, e.g., Lucas' "beyond any doubt" letter and the submission of documentary evidence of Dixie's existence.

### III. CONCLUSION

The Board's decision is supported by substantial evidence in the record as a whole. The ALJ reasonably chose to believe Wirthwein's testimony that he did not refuse the January 7 job offer. The union's treatment of Lindsey's hours as reflected in his pension report, and its stubborn refusal to recognize his work for Dixie, was arbitrary. Substantial evidence indicates that the union refused to tell Kessinger what additional information he should provide, even though he asked for such assistance, and even though Pennington provided such assistance to others. The petition for review is denied, and the cross-application for enforcement is granted.

*So ordered.*