**PLUMBERS AND PIPE FITTERS
LOCAL UNION NO. 32,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 93–1738.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1995.

Decided March 28, 1995.

Rehearing and Suggestion for Rehearing
In Banc Denied June 7, 1995.

Hugh Hafer, Seattle, WA, argued the cause, for petitioner. With him on the briefs was Ann–Marie McKittrick, Seattle, WA. John E. Rinehart, Seattle, WA, entered an appearance, for petitioner.

Julie B. Broido, N.L.R.B., Washington, DC, argued the cause, for respondent. With her on the brief were Linda R. Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Peter D. Winkler, N.L.R.B., Washington, DC.

Before: BUCKLEY, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

The Plumbers and Pipe Fitters Local Union No. 32 petitions for review of an order of the National Labor Relations Board and the Board cross-applies for enforcement. Adopting the decision of the administrative law judge, the Board found that Local 32 violated its duty of fair representation and committed an unfair labor practice by operating a hiring hall without objective, consistent standards. In accordance with circuit precedent, we reject petitioner's argument that the Board lacks jurisdiction to resolve a duty of fair representation challenge to the operation of a union hiring hall. Finding that the Board applied the correct legal standard and that its decision is supported by substantial evidence, we deny Local 32's petition for review and grant the Board's cross-application for enforcement.

### I.

In July 1992, Rockford Corporation d.b.a. Alaska Continental Pipeline Corporation began a pipeline construction job in the Long-view, Washington area. To perform the work, it needed to hire 13 "rig welders." Rig welders own their own welding machines and equipment which they bring to the jobsite mounted on trucks. The employer rents the welding rigs and compensates the welders for their labor.

The collective bargaining agreement between Rockford and the United Association of Plumbers and Pipe Fitters required the United Association to supply half of the rig welders, or seven of the 13 Rockford needed. The United Association chose Local 32 to operate a hiring hall, essentially an employment agency, to find and refer the needed rig welders. Local 32 ultimately referred 15 rig welders in order to fill seven positions because some rig welders failed a preliminary welding test and had to be replaced. The charges and findings of an unfair labor practice stem from the manner in which Local 32 selected these 15 rig welders.

Although Local 32 maintained hiring hall lists for other crafts, it referred pipeline welders infrequently and did not have a list for this craft. The union official responsible for staffing the Rockford job, business agent Donald Galloway, was unfamiliar with pipeline work. He asked Jeff Manning, who had attended a pipeline steward school and planned to serve as the union steward for the Rockford job, to compile a list of dependable and qualified rig welders. Galloway also gathered names of rig welders who had worked on a previous Local 32 job and those recommended by other United Association local business managers.

Local 32 did not promulgate any hiring hall rules with regard to the Rockford job. *Plumbers and Pipe Fitters Local Union No. 32*, 312 N.L.R.B. 1137, 1137, 1993 WL 449227 (1993) [hereinafter *ALJ Decision*]. Instead, Galloway allegedly relied on Manning's expertise to determine whom to refer. Manning did not rank the welders that he recommended. According to the ALJ, "[w]elders were not dispatched in order of application nor were they ranked in any manner." *ALJ Decision* at 1138. Nor did Galloway or Manning establish that Local 32 had any criteria by which it selected the replacements for

referred welders who had failed the preliminary welding test. *Id.*

The absence of articulated standards in Local 32's referral system came to light when two members of other United Association locals, experienced rig welders William Harper and Michael Flowers, sought work on the Rockford pipeline project. On July 3, they arrived on the Longview jobsite with their truck-mounted welding rigs and inquired about registering for work. Local 32 union steward Manning told them that he was gathering names for Al Sexton, the Local 32 business manager, and that Sexton would call them. Manning failed his welding test that day and ceased working on the project. Two days later, Harper and Flowers attempted to speak to Sexton at the union's office in Seattle, but they were unsuccessful. The union secretary informed them that Sexton was in a meeting and then that he had left the hall. Eventually, the union business manager for plumbing, not pipefitting, agreed to speak to them. He explained that Sexton and Galloway ran the pipeline work referrals and, when pressed by the men, accepted their travel cards and dues, and allowed them to sign what Harper and Flowers believed was an out-of-work list for pipeline work. Although they in fact had signed a list for construction work, the ALJ credited the manager's testimony that he did not intentionally mislead the men. *Id.*

After receiving no response from Sexton and learning that additional welders were taking the preliminary welding test, Harper and Flowers returned to the Longview jobsite. On July 10, a new union steward, Phil Stroud, asked Harper and Flowers to be patient, promising to let them take the welding test. When they returned later that day, Stroud advised the men to contact Rockford's foreman, which they did. They claim that the foreman told them that he did not need additional welders. Harper and Flowers remained in the area for several days, waiting for Local 32 to contact them, but it never did. Discouraged, they returned to California. On July 22, Flowers called Galloway who reported that all the welding jobs had been filled.

Harper and Flowers charged Local 32 with committing an unfair labor practice in the operation of its referral system. In identical charges, each alleged that Local 32 "failed to dispatch [him] for arbitrary, capricious and invidious reasons" in violation of sections 8(b)(1)(A) & (2) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A) & (2) (1988). The Board's General Counsel filed a consolidated complaint against Local 32, casting the alleged unfair labor practice as a breach of the duty of fair representation. After a hearing, the administrative law judge found that Local 32 failed to use objective criteria and standards in the operation of its hiring hall in violation of section 8(b)(1)(A) of the Act, and that Local 32 discriminated against Harper, Flowers and other rig welders seeking employment referrals for reasons not based on objective criteria and standards in violation of section 8(b)(2). *ALJ Decision* at 1139. He recommended that the Board order Local 32 to cease and desist from its unfair labor practice and that it order makewhole relief for Flowers and Harper. *Id.* The Board adopted his recommendations without opinion. *Id.* at 1137. Local 32 now petitions for review and the Board crossapplies for enforcement.

## II.

We must first address Local 32's claim that a breach of the duty of fair representation does not amount to an unfair labor practice and, as a result, that the Board lacked jurisdiction in this case. The judicially-created duty of fair representation arises from the union's status as the exclusive bargaining representative of all employees in a bargaining unit. *See* 29 U.S.C. § 159(a) (1988). A union breaches its "statutory duty fairly to represent all of those employees" when its actions are "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes,* 386 U.S. 171, 177, 190, 87 S.Ct. 903, 909, 916, 17 L.Ed.2d 842 (1967).

With its argument that the Board lacks jurisdiction over a complaint alleging a breach of the duty of fair representation, Local 32 seeks to revive a debate settled long ago in this circuit. As early as 1967, in *Truck Drivers, Local Union 568 v. NLRB,*

this court squarely held that a breach of the duty of fair representation can constitute an unfair labor practice within the jurisdiction of the Board. 379 F.2d 137, 141–42 (D.C.Cir. 1967). We relied on *Vaca v. Sipes,* noting the Supreme Court's "explicit assumption that unfair representation is an unfair labor practice." 379 F.2d at 142. *See also 2 The Developing Labor Law* 1413 (Patrick Hardin ed., 3d ed. 1992) (concluding that the Court's discussion of federal preemption in *Vaca v. Sipes* was necessarily premised on the assumption that the breach of a union's duty of fair representation constituted an unfair labor practice under § 8(b) of the Act).

Faced with this clear and binding precedent, Local 32 argues, citing our recent decision in *Lotus Suites, Inc. v. NLRB,* that the authority of *Truck Drivers* is "not significant" because the parties in that case did not litigate the issue of the Board's jurisdiction. 32 F.3d 588, 592 (D.C.Cir.1994). In *Lotus Suites,* however, we merely declined to rely on a Supreme Court decision which did not decide the issue before the panel. *Id. Truck Drivers* did decide the issue that Local 32 presents here, concluding that the Board has jurisdiction over a complaint alleging a breach of the duty of fair representation. *Truck Drivers,* 379 F.2d at 141–42. We have consistently followed the conclusion reached in *Truck Drivers,* as have other circuits that have decided the issue. *See, e.g., International Union of Elec., Elec., Salaried, Mach. and Furniture Workers v. NLRB,* 41 F.3d 1532, 1537 (D.C.Cir.1994); *see also NLRB v. Gen. Truckdrivers,* 778 F.2d 207, 213 (5th Cir.1985) (partial listing of circuits which decided that breach of the duty of fair representation may be an unfair labor practice). We follow *Truck Drivers* again today and turn to an examination of the Board's decision in this case.

### III.

■ According to well-accepted standards of review, we set aside a decision of the National Labor Relations Board only if it "acted arbitrarily or otherwise erred in applying established law to the facts" at issue, *International Union of Elec., Elec., Salaried, Mach. and Furniture Workers,* 41 F.3d at 1536 (citations and internal quotation marks omitted), or if its findings are not supported by "substantial evidence." 29 U.S.C. § 160(e), (f) (1988). In this case, the Board affirmed the ALJ's determination that Local 32 operated its hiring hall in violation of sections 8(b)(1)(A) and (2) of the Act, which prohibit a union from "restrain[ing] or coerc[ing]" employees in the exercise of their collective bargaining rights, 29 U.S.C. §§ 158(b)(1)(A), 157 (1988), or "caus[ing] or attempt[ing] to cause an employer to discriminate against an employee" in regard to employment so as to encourage union membership. 29 U.S.C. §§ 158(b)(2), (a)(3) (1988).

In *Boilermakers Local No. 374 v. NLRB,* 852 F.2d 1353 (D.C.Cir.1988), we reviewed the Board's application of sections 8(b)(1)(A) and (2) of the Act and the duty of fair representation to an exclusive hiring hall. We explained that a union must maintain a "high standard of fair dealing" when operating a hiring hall because "[t]he union's tremendous authority and the workers' utter dependence create 'a fiduciary duty on the part of the union not to conduct itself in an arbitrary, invidious, or discriminatory manner when representing those who seek to be referred out for employment by it.'" *Id.* at 1358 (quoting *Teamsters Local 519 (Rust Engineering),* 276 N.L.R.B. 898, 908, 1985 WL 57106 (1985) (citations omitted)). Summarizing the applicable law, we held that "a union commits an unfair labor practice if it administers the exclusive hall arbitrarily or without reference to objective criteria and thereby affects the employment status of those it is expected to represent." *Boilermakers,* 852 F.2d at 1358. We thus affirmed the Board's decision that the union breached its duty of fair representation and violated sections 8(b)(1)(A) and (2) by arbitrarily imposing registration requirements and refusing to inform applicants of the hiring hall rules. *See id.* at 1358, 1361. The ALJ's decision in this case is fully consistent with *Boilermakers.* The ALJ reviewed Local 32's actions to determine whether, in operating its exclusive hiring hall, it had established and employed objective standards in a nondiscriminatory manner. *ALJ Decision* at 1138.

Local 32 argues that the standard the ALJ applied is too demanding. Because the Board's General Counsel alleged a violation of the duty of fair representation, Local 32 maintains that the ALJ should have applied the "highly deferential" interpretation of the "arbitrary" component of that duty which the Supreme Court recently announced in *Air Line Pilots Ass'n, International v. O'Neill*, 499 U.S. 65, 78, 111 S.Ct. 1127, 1136, 113 L.Ed.2d 51 (1991). Using the language of *O'Neill*, Local 32 contends that its manner of operating the hiring hall was not "wholly irrational or arbitrary." *Id.* (internal quotation marks and citations omitted).

As Local 32 correctly points out, the *O'Neill* opinion begins with the holding that the *Vaca v. Sipes* tripartite standard of the duty of fair representation "applies to all union activity, including contract negotiations." *Id.* at 67, 111 S.Ct. at 1130. Immediately following is the "further" holding that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Id.* (internal quotation marks and citation omitted). Later in the opinion, the Court specifically states that the duty of fair representation applies when "a union is acting in its representative role, such as when the union operates a hiring hall." *Id.* at 77, 111 S.Ct. at 1135 (citing *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 87–89, 110 S.Ct. 424, 436–38, 107 L.Ed.2d 388 (1989)). These three statements are undeniably broad and, if read in isolation, support Local 32's contention that its actions in operating a hiring hall should be evaluated under the "highly deferential" standard of review. However, closer examination of the context in which the Court arrived at the "wholly irrational" refinement of the "arbitrary" component of the duty convinces us that the Court did not intend to weaken the standard of review applied to a union's operation of a hiring hall.

At issue in *O'Neill* was a duty of fair representation challenge to the substantive provisions of a strike settlement. Grounding its decision in national labor policy, the Su-preme Court found that, although the duty of fair representation applied to contract negotiations, "Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union." *Id.*, 499 U.S. at 78, 111 S.Ct. at 1135. The Court's focus on protecting the content of negotiated agreements from judicial second-guessing is apparent from its repeated references to "the substance of negotiated agreements," and "the final product of the bargaining process." *Id.* at 77–78, 111 S.Ct. at 1135–36. Attentive to the special role of the union as negotiator, the Court required that "[a]ny substantive examination of a union's performance ... must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Id.* at 78, 111 S.Ct. at 1135. "For that reason," the Court set forth the "wholly irrational" language, stating that "the final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a 'wide range of reasonableness' that it is wholly 'irrational' or 'arbitrary.'" *Id.* (citing *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953) (a case similarly addressing the scope of authority of union negotiators)).

■ This case does not involve a negotiated agreement. At issue here is the operation of a hiring hall, where the union has assumed the role of employer, as well as representative, and where the risk of judicial second-guessing of a negotiated agreement that was of such concern to the Court in *O'Neill* is simply not present. Although the Court rejected the union's attempt in *O'Neill* to differentiate between contract negotiations and contract administration, noting that no "bright-line" can be drawn between the two, *id.*, 499 U.S. at 77, 111 S.Ct. at 1135, a union's operation of a hiring hall is easily distinguishable from other activities where the union does not assume the role of employer. *Cf. id.* (indicating that some union activities, like the operation of a hiring hall, "fall into neither category"). As the Supreme Court has recognized, "if a union does wield additional power in a hiring hall by

assuming the employer's role, its responsibility to exercise that power fairly *increases* rather than *decreases.*" *Breininger,* 493 U.S. at 89, 110 S.Ct. at 437. We, too, have recognized the union's increased responsibility when it operates a hiring hall. In *Boilermakers,* we held that this dual role called for a "high standard of fair dealing." *Boilermakers,* 852 F.2d at 1358. More recently, we applied the "presumption of illegality" under section 8(b)(2) that "arises whenever an employee loses his job or hiring opportunity as a result of a union's conduct" in the operation of a hiring hall. *Radio–Electronics Officers Union v. NLRB,* 16 F.3d 1280, 1284 (D.C.Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 184, 130 L.Ed.2d 118 (1994). When a union operates a hiring hall and assumes the dual role of employer and representative, its obligation to deal fairly extends to all users of the hiring hall, not simply to its members or those that it represents.

■ We remain confident that unions that operate hiring halls without objective criteria violate their duty of fair representation. This was the standard that we approved in *Boilermakers* and that the ALJ properly applied in this case. Absent clear instructions from the Supreme Court, we decline to weaken this principle.

■ We next consider whether substantial evidence exists to support the ALJ's findings and the Board's conclusion that Local 32 operated its hiring hall in violation of sections 8(b)(1)(A) and (2). We are satisfied that it does. The ALJ's conclusion that the applicant pool was closed to anyone unknown to Local 32 officials is confirmed by Galloway's own testimony. He described three sources for the welder applicant list: welders whose reputations were known to Manning, welders who had worked on a previous union job and welders recommended by other local business managers. The barriers to unknown applicants are further illustrated by the runaround that Harper and Flowers encountered. The two men arrived on the jobsite, interested and available for work. Informed that Sexton was in charge of referrals, the men sought him out at the union office. Unable to meet with him, they left their travel cards, paid dues and requested that Sexton

contact them. Despite two weeks of waiting for a call from the union and repeated trips to the jobsite, the men were unable to even register for work. Local 32's defense of its operation as a "word-of-mouth" referral system misses the point. True, Harper and Flowers somehow heard about the welding jobs, but Local 32 then arbitrarily excluded them from applying for work. The union's actions plainly violated its fiduciary duty to treat applicants "even-handedly," to inform all potential applicants of relevant hiring hall rules, and to allow qualified individuals to register for work. *See Boilermakers,* 852 F.2d at 1357, 1358.

The ALJ concluded that Local 32's operation of the hiring hall constituted an unfair labor practice in a second important respect: it referred welders to the employer without objective standards. While the parties stipulated that Local 32 sought to refer "competent and reliable rig welders," the record is devoid of any indication of Local 32's method for accomplishing this goal. Galloway asserted that he relied on Manning's expertise; yet Manning testified that he did not rank the names on the list that he submitted, nor did he know how Galloway made his selections. *ALJ Decision* at 1138–39. Galloway and Manning offered no explanation of the criteria they used to select the first group of rig welders they dispatched, nor of the selection criteria for the welders they chose to replace those who failed the welding test. This inability to explain their criteria, in addition to the gathering of names through closed channels and the arbitrary exclusion of Harper and Flowers, supports the ALJ's finding that "at best a subjective test was used" that "discriminate[d] in favor of associates of Galloway and Manning." *ALJ Decision* at 1139. Local 32's claim on appeal that the ALJ rejected its referral system merely because it lacked written rules or a "paper trail" is flatly contradicted by substantial evidence that it had no objective criteria at all.

■ Equally without merit is Local 32's argument that we must set aside the Board's decision because the record contains no evidence that it favored its own members. This argument ignores our decision in *Boilermakers,* where we held that evidence of a "specif-

ic intent to discriminate on the basis of union membership or activity" is not required to find an unfair labor practice. *Boilermakers,* 852 F.2d at 1358. When considering violations of section 8(b)(2), we have recognized that "conduct by the union which causes firing or prevents hiring demonstrates the union's power so dramatically that its illegality is presumed." *Radio-Electronics Officers Union,* 16 F.3d at 1284 (citation and internal punctuation omitted). The union's argument also fails to recognize that the General Counsel's complaint did not allege specific discrimination in favor of the union's own members or against Harper and Flowers, but "rather that the arbitrary nature of the selection process breached the Union's duty of fair representation to all qualified applicants." *ALJ Decision* at 1138. The ALJ concluded that Local 32's conduct violated section 8(b)(2) because its subjective operation of the hiring hall ultimately resulted in the employer's refusal to hire Harper, Flowers or other unknown rig welders seeking referral. *Id.*

Finally, we are not persuaded by Local 32's argument that the ALJ's decision is inconsistent with prior Board decisions. Contrary to Local 32's contention, the Board did not condone the use of subjective criteria in *Morrison–Knudsen Co.,* 291 N.L.R.B. 250, 1988 WL 214153 (1988). There, the union referred workers according to priorities upon which it and the company had agreed, including employer requests for particular workers, workers who had previously worked for the employer, and minorities and women. *See id.* at 256–58. Apart from these agreed upon priorities, the union operated its hiring hall on a general "first-in, first-out" basis. *Id.* These criteria, although unwritten, were consistently applied and had been approved by the Board in earlier cases. *See id.* at 259. In *International Alliance of Theatrical and Stage Employees Local 592,* the other case that Local 32 cites, the Board found that the union referred workers according to "seniority, ability and availability," which are "objective standards." 266 N.L.R.B. 703, 710, 1983 WL 25086 (1983). The Board's decision in the instant case is not a departure from its consistent position that unions must use objective criteria, whether written or unwritten, in the operation of exclusive hiring halls.

We deny Local 32's petition for review and grant the Board's application for enforcement of its order.

*So ordered.*