# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 7, 2015          Decided August 21, 2015

No. 12-1002

TEAMSTERS LOCAL UNION NO. 509,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

THOMAS TROY COGHILL,
INTERVENOR

———

Consolidated with 12-1103

———

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

———

*Jonathan G. Axelrod* argued the cause and filed the briefs for petitioner.

*Robert J. Englehart*, Supervisory Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel,

and *Tyler James Wiese*, Attorney. *Micah P. Jost*, Attorney, entered an appearance.

*W. James Young* argued the cause and filed the brief for intervenor.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*:

The National Labor Relations Board concluded that Teamsters Local Union No. 509 committed unfair labor practices by operating a hiring hall that helped only its own members gain employment. For the reasons set forth below, we deny the union's petition for review and grant the Board's cross-application for enforcement.

I

A

Section 7 of the National Labor Relations Act (NLRA) grants employees the right to organize, collectively bargain, and otherwise band together for "mutual aid or protection." 29 U.S.C. § 157. But the Act also grants employees the right to refrain from doing so. *Id*. To enforce these rights, the Act bars employers and unions from conditioning employment on a worker's decision to either join or refuse to join a union. *See id*. § 158(a), (b). In other words, the NLRA "erect[s]" a "wall . . . between organizational rights and job opportunities." *Lummus Co. v. NLRB*, 339 F.2d 728, 734 (D.C. Cir. 1964); *see also Radio Officers' Union v. NLRB*, 347 U.S. 17, 40 (1954)

(explaining that the NLRA "allow[s] employees to freely exercise their right to join unions, be good, bad, or indifferent members, or abstain from joining any union without imperiling their livelihood").

These same principles apply to hiring halls—union-backed organizations that refer workers to employers that have entered a collective bargaining agreement with the union. *See Boilermakers Local No. 374 v. NLRB*, 852 F.2d 1353, 1358 (D.C. Cir. 1988). Hiring halls are a basic feature of the labor workforce, and "[i]n some industries, most jobs are filled through referrals from union hiring halls." *Hiring Halls*, National Labor Relations Board, https://www.nlrb.gov/rights-we-protect/whats-law/employees/ i-am-represented-union/hiring-halls (last visited Aug. 21, 2015). Hiring halls pose no problem under the NLRA so long as an employer is free to hire other workers without using the hiring hall. Exclusive hiring halls, however, create cause for concern. Under these arrangements, an employer agrees to hire *only* workers referred by the union running the hiring hall. Although not illegal per se, exclusive hiring halls are held to "a high standard of fair dealing" because of their potential to coerce workers to join the union as the price for gaining access to job opportunities. *Boilermakers Local No. 374*, 852 F.2d at 1358. Because of this concern with workplace coercion, we have held that an exclusive hiring hall is lawful only if it is open to all potential workers, not just members of the sponsoring local. *Id*. On the other hand, an exclusive hiring hall limited to only the local's members, known as a members-only exclusive hiring hall, is unlawful under the NLRA. *See Local Union No. 948, Int'l Bhd. of Elec. Workers, (IBEW), AFL-CIO v. NLRB* (*Local 948*), 697 F.2d 113, 116-19 (D.C. Cir. 1982) (holding that it is unlawful coercion for an exclusive hiring hall to deny access to members of local unions other than the local operating the hiring hall).

4

B

In 2006, ABC Studios began production in South Carolina of a television show called *Army Wives*.[1] Needing drivers to transport talent, crew, and equipment to various locations, ABC Transportation Coordinator Lee Siler contacted Local 509 (the union, or the local),[2] which operated a referral service for drivers seeking jobs in the entertainment production business in South Carolina. Local 509 gave Siler a list of qualified drivers, all of whom were Local 509 members, and Siler filled his staffing needs for the pilot episode from that list. After the pilot was filmed but before production began on the first season, ABC and Local 509 negotiated a collective bargaining agreement for drivers working on the production of the first two seasons of *Army Wives*. According to the agreement's terms, ABC committed to fill its need for drivers by hiring only from the list of qualified drivers the local would provide at the beginning of each season. In other words, ABC agreed to hire from an exclusive hiring hall run by Local 509. All the drivers on the list the local delivered before the first season were Local 509 members.

Staffing drivers for the first two seasons of *Army Wives* turned out to be difficult because of the rapid growth of entertainment productions in South Carolina. After hiring all that he could from Local 509's list for the first season, Siler

---

[1] *Army Wives* was a fictional drama that "follow[ed] the struggles, dreams and friendships of a diverse group of women—and one man—living with their spouses and families on an active Army post." *Army Wives*, LIFETIME, http://www.mylifetime.com/shows/army-wives (last visited Aug. 21, 2015).

[2] To be clear, any reference to "the union" refers specifically to Teamsters Local Union No. 509 and no other local.

looked elsewhere for help.[3] He found it in Thomas Troy Coghill, a member of Teamsters Local Union No. 391 in North Carolina with whom Siler had previously worked on other jobs. Coghill was one of a handful of drivers who were not members of Local 509 but worked on *Army Wives* during the show's first season. By all accounts, he was a reliable driver, and when the demand for drivers once again outstripped what the union could provide, Siler rehired him at the start of filming for the second season.

Later on during filming for the second season, two Local 509 drivers who had worked for ABC during the first season asked to re-join the production. Siler hired them, but only for part-time work. Local 509 president L.D. Fletcher complained that drivers in his local should receive full-time work before nonmembers like Coghill. When Siler refused to replace drivers who did not belong to Local 509 with drivers who did, Fletcher complained to ABC's attorney, who scheduled a meeting with the local and relevant production personnel to discuss the disagreement on May 13, 2008. At that meeting, Fletcher repeated his complaint, threatened that Local 509 members would picket the filming of *Army Wives* if his members did not receive full-time work before others, and boasted that he could and would shut down the entire production if his demand was not met. ABC nevertheless continued to employ Coghill throughout the filming of the second season.

In June 2008, while filming for the second season was still under way, Local 509 closed its referral list, meaning that no

---

[3] The union does not argue before us that ABC violated the collective bargaining agreement by hiring drivers who were not on the referral list after Siler hired all that he could from the list.

new drivers could have their names added to it.[4] By the time filming was completed in the fall of 2008, Coghill and three specialty drivers whose jobs included tasks no one in the local was qualified to perform were the only drivers working on *Army Wives* who did not belong to Local 509 and were not on the referral list. In light of Fletcher's demand, Siler told Coghill after the season ended that he should move to South Carolina and join Local 509 if he wanted to work on future seasons of the show. In November 2008, Coghill wrote to both his local in North Carolina and Local 509 to report that he planned to move to Charleston, South Carolina, and that he wanted to transfer his membership to Local 509. Fletcher told Coghill in a telephone conversation that the referral list was closed, but Coghill sent an application to Local 509 along with a check for initiation and administrative fees in January 2009, hoping to join a waitlist. The union returned the application and check at the end of the month along with a letter explaining that no names were being added to the referral list.

In early 2009, Local 509 and ABC negotiated another collective bargaining agreement, this one governing the third and fourth seasons of *Army Wives*. Like the contract that governed the previous seasons, this agreement included a provision requiring the studio to hire drivers from Local 509's referral list before hiring others, thus continuing the exclusive hiring hall. And as before, the list of drivers Local 509 gave Siler before the third season included only its own members. But the economics of the industry in South Carolina had changed since season two, and a number of productions had wound down. In the previous seasons, the studio's need for

---

[4] Local 509's Executive Board agreed to an exception that allowed drivers who had previously been on the list to seek reinstatement if they became current in dues or administrative fees. That exception is not relevant here.

drivers outpaced what the local could supply, but now there were more than enough drivers on the local's list to satisfy ABC's staffing needs for the third season. Because Coghill was not on the list, Siler did not hire him for the third season.[5] Both Siler and his boss later testified that they would have hired Coghill had he been on the list.

B

Coghill filed an unfair labor practice charge against Local 509 with the NLRB Regional Director whose jurisdiction covered South Carolina, and the NLRB General Counsel followed up with a complaint on February 9, 2009. The complaint accused Local 509 of coercing workers into joining the local by referring only its own members to ABC, in violation of section 8(b)(1)(A) of the NLRA.[6] The complaint also accused Local 509 of causing ABC to refuse to hire Coghill because he did not belong to the local, in violation of section 8(b)(2).[7]

---

[5] In an effort to mitigate potential damages, Local 509 added Coghill to its referral list for the fourth season of *Army Wives* after the NLRB General Counsel issued the complaint in this case. ABC then hired him off the list.

[6] Section 8(b)(1)(A) of the NLRA makes it an unfair labor practice for a union "to restrain or coerce . . . employees in the exercise of the rights guaranteed" in section 7 of the Act, which includes "the right to refrain from" joining a union. 29 U.S.C. § 158(b)(1); *id.* § 157.

[7] Section 8(b)(2) prohibits a union from causing an employer to condition employment on whether a worker is a union member. *See* 29 U.S.C. § 158(b)(2), (a)(3). We have held that this section prohibits locals from causing an employer to refuse to hire a member of a different local. *See Local 948*, 697 F.2d at 116-19.

After a February 23, 2010, hearing before an Administrative Law Judge (ALJ), the General Counsel sought to amend the complaint to accuse Local 509 of committing an additional unfair labor practice by closing the referral list in June 2008.[8] The ALJ refused to consider the amendment, concluding that Local 509 lacked notice that it might face liability for closing the list. *See ALJ's Decision and Order*, *Int'l Bhd. of Teamsters, Local 509* (*ALJ Decision*), Docket No. 11-CB-4020, at 9 (Dep't of Labor Mar. 9, 2011). Because he had declined to permit the amendment, the ALJ expressly declined to determine whether closing the list was in fact unlawful but went on to find that Local 509 was operating a members-only exclusive hiring hall that discriminated against Coghill because he did not belong to the local. *Id*. at 8-9. That led the ALJ to conclude that Local 509 had committed two unfair labor practices. First, by refusing to place Coghill on its list and refusing to refer him for employment, the local had effectively punished him for failing to join its ranks, in violation of section 8(b)(1)(A). *ALJ Decision* at 9-10. Second, the local had also caused ABC to refuse to hire Coghill because he did not belong to Local 509, in violation of section 8(b)(2). *ALJ Decision* at 9-10. The ALJ also found that ABC would have hired Coghill to work on season three of *Army Wives* if not for Local 509's demand that the studio hire only its members. *Id*. at 9. As a result, the ALJ granted Coghill backpay, ordered the local to open its referral list to workers who did not belong to Local 509, and required the local to post a notice disclosing its violations. *Id*. at 12-13.

Local 509 appealed the ALJ's decision to the NLRB. On appeal, the local argued that the only reason it did not refer Coghill to ABC in November 2008 was that it had previously

---

[8] The Board has not explained to us its theory of how closing the list may have violated the NLRA.

closed its referral list in June 2008, an act the ALJ had refused to find unlawful. The Board rejected that defense and instead affirmed the ALJ's "rulings, findings, and conclusions" and adopted his proposed order. *Int'l Bhd. of Teamsters, Local 509 (ABC Studios)*, 357 N.L.R.B. No. 138, 1 (Dec. 13, 2011). The Board concluded that "[t]he manner in which [Local 509] maintained the list was itself unlawful and discriminatory. . . . [C]losing the list . . . merely perpetuated the unlawful effect of its prior maintenance of a members-only, exclusive hiring hall." *Id*. Of special significance to this petition, the Board further explained that "regardless of whether the list was open or closed, the [local] would not have placed Coghill, a nonmember, on the list or referred him for employment." *Id*.

Local 509 timely petitioned for review of the Board's decision, and the Board cross-applied to seek enforcement of its order. We have jurisdiction under 29 U.S.C. § 160(e), (f).

II

Local 509 presents three arguments. First, the union claims that the Board violated its own regulations and denied the union due process by concluding that the closure of the referral list was unlawful. Second, the union alleges that the Board impermissibly held it liable for events that fell outside of the NLRA's statute of limitations. Lastly, the union argues that substantial evidence does not support the Board's conclusions that the union was operating a members-only exclusive hiring hall before it decided to close its list and that the union would have refused to place Coghill on the list had it remained open. We reject each argument in turn and uphold the Board's decision.

10

A

After the hearing before the ALJ concluded, the General Counsel sought to amend the complaint to charge Local 509 with an unfair labor practice for closing its referral list. The ALJ refused the amendment, reasoning that assigning liability based on the new proposed charge would deprive Local 509 of due process because the union did not have the opportunity to litigate the issue at the hearing. The General Counsel did not appeal that finding to the Board. Before us, Local 509 argues that the Board's final decision created precisely the due process violation that the ALJ sought to avoid. The union argues that the Board held it liable for closing the referral list, even though the parties never litigated whether that act violated the NLRA. As evidence of this error, the union points to the Board's statement that "closing the list . . . merely perpetuated the unlawful effect of its prior maintenance of a members-only, exclusive hiring hall." To the union, this statement indicates that the Board found the act of closing the list unlawful. As a result, the union contends that it was deprived due process for the very reasons that the ALJ rejected the General Counsel's proposed amendment. The union also complains that the Board's decision implicitly reversed the ALJ's refusal to amend the complaint even though the Board's regulations forbid it from considering any issue not appealed by a party, *see* 29 C.F.R. § 102.46(g) ("No matter not included in exceptions or cross-exceptions may thereafter be urged before the Board, or in any further proceeding.").

The union's argument misreads what the Board actually did. Rather than holding the union liable for closing the list in June 2008, the Board found that the union violated the Act "by failing to place Coghill on its referral list for arbitrary, discriminatory, and invidious reasons and thereafter by failing to refer him for employment" and by "causing [ABC] to

discriminate against Coghill by not hiring him to work for season three of *Army Wives* because he was not a member of [Local 509]." *Local 509*, 357 N.L.R.B. No. 138 at 1. The union's decision to close the list was at issue because the union relied upon it as a defense. The Board rejected that defense and concluded the closure of the list was irrelevant to its finding that Local 509 had committed unfair labor practices when it refused to refer Coghill for employment and caused ABC not to hire him for the third season of *Army Wives*. As the Board stated clearly in reaching its conclusion, "*whether the list was open or closed*, the [union] would not have placed Coghill, a nonmember, on the list or referred him for employment." *Id*. (emphasis added). This finding was consistent with the ALJ's determination that Local 509 was operating a members-only exclusive hiring hall at the time it refused to refer Coghill for employment. *See ALJ Decision* at 8-9. The ALJ, like the Board, believed that the union's refusal to refer Coghill for employment had nothing to do with the list being closed and everything to do with the fact that Coghill did not belong to Local 509. Stated simply: The premise of the union's due process argument is mistaken because the Board did not find it liable for closing the list. We need not consider the argument any further.

B

Local 509 argues that the NLRA's six-month statute of limitations, *see* 29 U.S.C. § 160(b), bars the Board from charging it with unfair labor practices for refusing to refer Coghill to ABC and causing the studio not to hire him because those acts were allegedly inseparable from the act of closing the list. The union relies upon the Supreme Court's decision in *Local Lodge No. 1424 v. NLRB* (*Bryan Manufacturing*), which held that the NLRA's statute of limitations prevents the Board from holding a party liable for conduct "inescapably grounded

on events" that fell beyond the statute's horizon. 362 U.S. 411, 422 (1960).

Local 509 acknowledges, as it must, that its November 2008 refusal to refer Coghill to ABC occurred within six months of when the General Counsel levied charges in February 2009 based on that conduct. But the union argues that the statute of limitations nonetheless immunizes it from liability here because its November 2008 actions were "inescapably grounded" on its closing of the list, which took place in June 2008—more than six months before the charges. As the union sees it, refusing to refer Coghill to ABC was not illegal unless closing the list was illegal. The union asks us, in other words, to deny the Board the authority to bring a charge based on conduct that clearly took place within the limitations period because that conduct was too intertwined with conduct that took place outside of it.

But even assuming that *Bryan Manufacturing* stands for such a sweeping exception to the statute of limitations, it still would not help the union here. The union's argument depends on the assumption that its refusal to refer Coghill to ABC in November 2008 was inseparable from the June 2008 closing of the list. But the two acts *are* separable. The Board clearly explained its belief that the list simply had nothing to do with Local 509's actions in November 2008. *See Local 509*, 357 N.L.R.B. No. 138 at 1 ("[R]egardless of whether the list was open or closed, the [union] would not have placed Coghill, a nonmember, on the list or referred him for employment."). As the Board saw it, Local 509 did not refer Coghill to ABC because he was not a Local 509 member. Whether the list was open, unlawfully closed, or lawfully closed was beside the point. The Board's conclusion was thus not "inescapably grounded on events predating the limitations period," *Bryan Manufacturing*, 362 U.S. at 422, but instead was expressly

grounded on distinct events that inarguably fell within that period. Nor does it matter that the Board referenced actions that occurred outside the limitations window, such as "[t]he manner in which the [union] maintained the list." *Local 509*, 357 N.L.R.B. No. 138 at 1. As the Board points out, it may rely upon earlier events to "illuminate" why the union refused to refer Coghill in November 2008. *See Bryan Manufacturing*, 362 U.S. at 416 ("[W]here occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices . . . earlier events may be utilized to shed light on the true character of matters occurring within the limitations period."). Because the Board held Local 509 liable only for conduct that occurred within six months of when the General Counsel brought charges, we hold that the Board's decision did not violate the NLRA's statute of limitations.

C

Finally, Local 509 claims that substantial evidence does not support the Board's conclusions that the union ran a members-only exclusive hiring hall and that the union would not have placed Coghill on the referral list had it remained open. "[O]ur role in reviewing an NLRB decision is limited. We must uphold the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by substantial evidence . . . ." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 348 (D.C. Cir. 2011) (internal quotation marks and citation omitted).

The Board's determination comfortably meets this standard. The record is filled with evidence suggesting that Local 509 was managing an exclusive hiring hall open only to its members and that it refused to refer Coghill for employment because he was not.

There is no dispute that only Local 509 members were on the list at the time it closed. Indeed, the union freely admits that "persons wanting to go on the [referral list] were sent applications [that] included a membership application and a request for an initiation fee" and that "[p]ersons who applied to become members were added to the [l]ist." Appellant's Br. 32. Additionally, the union has identified only one worker who was not a Local 509 member but who nevertheless was placed on the list during the first two seasons of *Army Wives*. The record reveals that this driver applied to join the union in 2006, and there is no evidence that she was on the list before then. What's more, that driver did join the union after being placed on the list, and the Board could infer that her addition was conditioned on her eventual membership. And finally, the union's referral policy, which described how the union managed the list, referred to names of drivers hired from the list not as "drivers" or "workers" but as "members." J.A. 535-36. The Board could reasonably conclude from all of this evidence that the only way to gain access to Local 509's exclusive hiring hall was to be a member of Local 509 or agree to become one. That is illegal.

The behavior of Fletcher, Local 509's president, also supports the Board's conclusion that the union unlawfully used the list to help only its members secure employment. When Fletcher discovered that Coghill was working full-time on *Army Wives* at the same time that Local 509 union members were working part-time, he called Siler to complain. He protested that "our people" were not working full-time and warned Siler and his supervisor that they must use Local 509 members "before using people out of jurisdiction." Fletcher raised the same complaint at the May 13, 2008, meeting with ABC, objecting that Siler was using drivers from other local unions "while our people [are] not working." He declared

"that's not going to happen." Most tellingly, Fletcher said at the meeting that he would drop his complaint against ABC if Siler would "get rid of other people and work [Local] 509 people."

In sum, substantial evidence supports the Board's conclusions that Local 509's referral list was open only to its members, that Local 509 refused to refer Coghill for employment because he was not a member, and that the union would not have added Coghill to its list even it had remained open because he was not a member.

### III

For the foregoing reasons, we deny Local 509's petition for review and grant the Board's cross-application for enforcement of its order.